M<small>ETROPOLITANA</small> S.E. (A<small>TRIUM</small> P<small>LAZA</small>) 88-16A 365 C<small>PA</small> y <small>OTROS</small>, demandantes y recurridos, *v.* A<small>DMINISTRACIÓN</small> <small>DE</small> R<small>EGLA</small>-<small>MENTOS</small> y P<small>ERMISOS</small>, demandados y peticionarios; A<small>SOCIA</small>-<small>CIÓN</small> <small>DE</small> R<small>ESIDENTES</small> de la A<small>VENIDA</small> S<small>AN</small> P<small>ATRICIO</small> y Á<small>REAS</small> C<small>IRCUNDANTES</small>, I<small>NC</small>., interventores.

*Número:* CE-93-474          *Resuelto:* 10 de abril de 1995

*Héctor Febo Serrano*, abogado de la parte peticionaria; *Daniel Martínez Oquendo*, abogado de la parte recurrida; *Juan R. Marchand Quintero*, de *Rivera Cestero & Marchand Quintero*, abogado de la parte interventora.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

La Administración de Reglamentos y Permisos (en adelante A.R.PE.) nos solicita que revisemos la sentencia del Tribunal Superior que revocó la denegación de los permisos de construcción de cinco (5) proyectos residenciales de tipo multifamiliar en la Avenida San Patricio en Guaynabo. Revocamos.

I

En el verano de 1987 Metropolitana S.E. solicitó en A.R.PE. una extensión del plazo para cumplir con unas condiciones que la agencia había impuesto el año anterior al concederle un permiso de construcción provisional para un proyecto multifamiliar en la Avenida San Patricio. Durante ese año, otras empresas también presentaron ante A.R.PE. unos anteproyectos de construcción de unidades multifamiliares en las inmediaciones de esa misma avenida. Debido a que los proyectos estaban en el mismo sector, A.R.PE. remitió todos los casos a la Junta de Planificación (en adelante Junta) para sus comentarios.

A fines de 1987, la Junta recomendó que se denegara el permiso de uno de estos proyectos, *Castillo del Rey*, porque

" 'actualmente la infraestructura vial del sector no era suficiente para la cantidad de tránsito que circulaba por ella' ". (Énfasis suprimido.) Petición de *certiorari*, pág. 4. Posteriormente, en febrero de 1988 la Junta contestó la consulta sobre el otro proyecto, *San Patricio Tower*, y recomendó que se coordinaran con el Departamento de Transportación y Obras Públicas los accesos del proyecto "para evitar que se agrave la condición de congestión vehicular en dicho lugar", ya que la infraestructura vial se encontraba "operando a unos niveles de servicios inadecuados". (Énfasis suprimido.) Íd., pág. 5.

Por su parte, A.R.Pe. cursó una misiva al Negociado de Planes de Usos de Terrenos de la Junta de Planificación " 'para que se determinara la densidad recomendable para ese sector' ". (Énfasis suprimido.) Petición de *certiorari*, pág. 5. Mediante comunicación de abril de 1988 la Junta reiteró que la infraestructura vial de ese sector de la Avenida San Patricio no era suficiente para la cantidad de tránsito que circulaba por ella. Además, recomendó la celebración de vistas públicas para hacer una evaluación ambiental del efecto acumulativo de los proyectos " 'sobre la capacidad de los sistemas de infraestructura, especialmente el tránsito' ". (Énfasis suprimido.) Íd., pág. 6. La Junta basó su recomendación en que los proponentes de los proyectos "no han probado en conjunto que la acción solicitada no vaya a tener efectos adversos significativos sobre la calidad de vida del sector". (Énfasis suprimido.) Íd., pág. 6.

A tenor con esta recomendación A.R.Pe. consolidó los proyectos y convocó a vistas públicas. En el aviso de vistas públicas conjuntas A.R.Pe. informó a los proponentes de los proyectos sobre un estudio de tránsito y estacionamiento en el área en controversia preparado por el Departamento de Transportación y Obras Públicas, el cual reflejó un nivel

de servicio inadecuado en el sistema de carreteras en ese sector del área metropolitana.

Celebrada la vista pública, y luego de oir a los proponentes de los proyectos y a los vecinos, el Comité de Asesoramiento, Consultas y Revisión de A.R.PE. denegó los distintos permisos solicitados. Este comité adoptó el informe de los oficiales examinadores que celebraron la vista conjunta. Dicho informe concluyó lo siguiente:

> ... Es forzoso concluir, a la luz de la prueba desfilada y la información existente en los expedientes de los casos de epígrafe, que la infraestructura vial es inadecuada en el sector de la Avenida San Patricio, aún sin tomar en cuenta la afluencia vehicular adicional que representará la operación del edificio Caguas Central y el efecto acumulativo de los proyectos propuestos y potenciales. Si añadimos esta afluencia vehicular, más aquella producida o generada por otros nuevos desarrollos que se verifican al presente en el sector, tales como la construcción del edificio de la Telefónica en la Avenida Roosevelt, la ampliación del centro comercial San Patricio Shopping Center, y otros edificios multipisos que se han construido en el sector ... resulta evidente que la insuficiencia de infraestructura vial se agravará aún más si se permite el desarrollo de los proyectos de epígrafe tal y como han sido presentados. (Énfasis suprimido.) Anejo 7, pág. 211.

Además, los examinadores observaron que era "inescapable determinar que las deficiencias de la infraestructura vial en el sector de la Avenida San Patricio son de una gran seriedad, y que las obras de mitigación propuestas no han demostrado que sean efectivas". Anejo 7, pág. 212. Por lo tanto, concluyeron que las deficiencias en las vías de acceso y los estacionamientos de los proyectos en cuestión "provocaría[n] una grave acumulación de tránsito [en el sector] que hace los proyectos ... intolerables ambientalmente". Anejo 7, pág. 215.

De esta resolución, los proponentes acudieron al Tribunal Superior cuestionando la decisión administrativa. Dicho foro consolidó los casos, revocó la resolución recurrida

y devolvió los mismos a A.R.Pᴇ. para que fueran reevaluados individualmente y no consolidadamente. En su dictamen el tribunal a quo señaló que el "impacto nocivo y acumulativo en el tráfico, no constitu[ía] para nosotros una condición especialísima que amerite obviar la aplicación de disposiciones reglamentarias y en su defecto adoptar el método de análisis provisto en el Artículo 9(b) ...". Anejo 1, pág. 11. Por esta razón, el Tribunal Superior concluyó "que la decisión de la A.R.Pᴇ. constituyó una aplicación errónea del derecho que ha traído consigo un efecto devastador: restringir el uso de esas propiedades". Íd.

Oportunamente, A.R.Pᴇ. recurrió ante el Tribunal de Apelaciones y cuestionó que se revocara la decisión de la agencia de consolidar los proyectos y considerar su impacto acumulativo. Además, señaló que el foro de instancia sustituyó su propio criterio por el de la agencia administrativa en violación de las disposiciones establecidas estatutariamente restringiendo el alcance de la revisión judicial de las decisiones de A.R.Pᴇ.

El Tribunal de Apelaciones expidió los recursos. Sin embargo, como dicho foro fue derogado en virtud de la Ley Núm. 11 de 2 de junio de 1993, los recursos fueron elevados a este Tribunal. A solicitud de A.R.Pᴇ., la dispensamos de someter el alegato reglamentario y concedimos término a todos los proponentes de los proyectos para que sometieran sus escritos. Habiendo comparecido por los proponentes solamente Metropolitana S.E., y por los vecinos la Asociación de Residentes de la Avenida San Patricio, estamos en posición de adjudicar la controversia ante nos.

## II

En virtud de la Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 *et seq.*) se creó A.R.Pᴇ. A ésta se le otorgó la responsabilidad de ejecutar las funciones operacionales que hasta entonces desempeñaba la Junta y de

aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación. Véase Exposición de Motivos de la Ley Núm. 76 de 24 de junio de 1975, Leyes de Puerto Rico, pág. 234.

■ Del historial legislativo de esta ley se desprende que esta agencia se estableció especialmente con el propósito de velar "por la conveniencia de log[r]ar desarrollos urbanos compactos y evitar lotificaciones y urbanizaciones en áreas que no estén listas para tales desarrollos debido a falta de infraestructuras y a desarticulaciones con desarrollos urbanos existentes". Informe Conjunto de las Comisiones de Gobierno, de Desarrollo Socioeconómico y de Hacienda de la Cámara de Representantes sobre el P. del S. 1076. Con estos propósitos se dispuso que A.R.Pe. debía establecer "estrecho enlace y coordinación con la Junta de Planificación, el Departamento de Recursos Naturales, la Junta de Calidad Ambiental y los demás organismos gubernamentales para lograr que la política pública ambiental, y asimismo la política pública sobre el desarrollo económico, social y físico de Puerto Rico ... se estructuren mediante el esfuerzo integral de todos los organismos gubernamentales ...". 23 L.P.R.A. sec. 71d(r).

■ Al explicar el alcance de esta disposición, el Informe Conjunto, *supra*, explicó que la nueva ley específicamente concedía poder a A.R.Pe. para "[s]olicitar como condición previa a la otorgación de permisos, notificación de posibles fuentes detrimentales al ambiente y solicitar evidencia de cumplimiento con los reglamentos del Departamento de Recursos Naturales, de la Junta de Planificación y de la Junta de Calidad Ambiental ...". De esta manera se dotó a A.R.Pe. con los instrumentos necesarios para servir de enlace y coordinar los diversos organismos gubernamentales "para lograr que la política pública ambiental, y asimismo la política pública sobre el desarrollo económico, social y físico de Puerto Rico ... se estructuren mediante el esfuerzo integral de todos los organismos gubernamenta-

les, para proveer el máximo beneficio a la comunidad puertorriqueña". 23 L.P.R.A. sec. 71d(r).

■ Por otro lado, con el propósito de garantizar una coordinación entre la política pública para mejorar nuestro medio ambiente y las estrategias de desarrollo integral del país, la Asamblea Legislativa delegó en la Junta la facultad de aprobar preliminarmente los planes de la Junta de Calidad Ambiental. 23 L.P.R.A. sec. 62X.

■ Mediante el Art. 9(b) de la Ley Orgánica de la Administración de Reglamentos y Permisos, 23 L.P.R.A. sec. 71h(b), se le concedió a A.R.PE. la facultad de denegar discrecionalmente un proyecto dentro de un sector que tiene problemas tan especiales que hacen impracticables la aplicación de la zonificación vigente para esa área:

> Cuando cualquier sector, dentro de cuyos límites se hubiere solicitado autorización para algún proyecto de lotificación simple, o un permiso de construcción o uso, presentare características tan especiales que hicieren impracticables la aplicación de las disposiciones reglamentarias que rijan para esa zona, e indeseable la aprobación del proyecto, debido a factores tales como salud, seguridad, orden, defensa, economía, concentración de población, ausencia de facilidades o mejoras públicas, uso más adecuado de las tierras, o condiciones ambientales, estéticas o de belleza excepcional, la Administración podrá, en la protección del bienestar general y tomando en consideración dichos factores, así como las recomendaciones de los organismos gubernamentales concernidos, denegar la autorización para tal proyecto o permiso. 23 L.P.R.A. sec. 71h(b).

Si el proyecto presenta unas características que lo hacen impracticable en un área, esta disposición claramente faculta a A.R.PE. a denegar el permiso de construcción o de uso, o la petición de lotificación simple "mientras existan las condiciones desfavorables", aunque el uso propuesto esté permitido por la zonificación vigente. 23 L.P.R.A. sec. 71h(b). Este análisis sectorial corresponde hacerlo cuando el área presente unas características tan especiales que el proyecto no deba llevarse a cabo, o el mismo resulte ser

"indeseable" para esa área([1]) porque se afecten adversamente uno o más de los elementos siguientes: salud, seguridad, orden, defensa, economía, concentración de población, ausencia de facilidades o mejoras públicas, uso más adecuado de las tierras, o condiciones ambientales, estéticas o de belleza excepcional.

Uno de estos criterios es la "ausencia de facilidades o mejoras públicas". Las obras públicas, particularmente las calles y carreteras, constituyen una de las mejoras públicas que tradicionalmente han sido consideradas por la Junta y A.R.Pe. al aprobar o denegar proyectos de construcción en cualquier sector cuyo desarrollo esté controlado.

Por lo tanto, A.R.Pe. está autorizada a denegar un proyecto sometido porque agrava la congestión vehicular en un sector que no tiene las vías públicas que se requieren para el tráfico existente o el que se generaría con la construcción propuesta.

Este poder se extiende particularmente a los proyectos permitidos por la zonificación vigente y requiere que el Estado considere el impacto del incremento en vehículos que utilizarán las vías y los estacionamientos públicos sobre un área zonificada como consecuencia de un proyecto. Este poder constituye un instrumento importante en la planificación y zonificación de nuestros espacios urbanos. Véase 1 *Anderson, Am. Law of Zoning* Sec. 7.09, págs. 702–703 (3ra ed. 1986).

Con pleno conocimiento del alcance de esta autoridad para denegar proyectos, el Art. 9(b), *supra*, dispone unas salvaguardas procesales que le ofrecen a la persona afectada por una decisión una oportunidad de ser oído en una vista pública. Celebrada la vista, la ley requiere que

---

[1] El Art. 17 de la Ley Orgánica de la Junta de Planificación de Puerto Rico también otorga este mismo poder a esa agencia para denegar la autorización para un proyecto que presente características especiales. 23 L.P.R.A. sec. 62p.

A.R.Pᴇ. formule por escrito los fundamentos para rechazar el proyecto.

▇▇▇▇▇▇ Al celebrar estas vistas, A.R.Pᴇ. también tiene un poder inherente de consolidar los proyectos propuestos por distintas personas para examinar el efecto acumulativo de éstos sobre el sector para determinar si en su conjunto presentan características especiales que los hacen "impracticables" o "indeseables" para el área. Sin embargo, una vez se consolidan todos los proyectos, la agencia tiene varios cursos de acción. En primer lugar, puede aprobar o rechazar todos los proyectos presentados porque su efecto acumulativo es indeseable para el sector. También puede aprobar unos y rechazar otros, a la luz de la situación del área y la naturaleza de cada uno de los proyectos. Lo importante es que la decisión final de la agencia esté adecuadamente fundamentada bajo los criterios expuestos en el Art. 9(b), *supra*. De esta manera, cada uno de los proponentes podrá estar en posición de no continuar con sus planes, modificar los proyectos presentados o apelar la decisión a los tribunales.

## III

Del análisis anterior sobre el Art. 9(b) de la Ley Orgánica de la Administración de Reglamentos y Permisos, *supra*, se desprende claramente que el Tribunal Superior se equivocó en su interpretación del poder delegado a A.R.Pᴇ. Dicha agencia gubernamental aplicó correctamente el Art. 9(b), *supra*, a la situación de autos. Es precisamente esta disposición la que le otorga poderes a A.R.Pᴇ. para considerar el impacto que en su conjunto puedan tener varios proyectos sobre un sector, aunque éstos estén previamente permitidos en esa área por los reglamentos de zonificación.

En este caso, A.R.Pᴇ. consultó a la Junta de Planes y se le recomendó que los referidos proyectos no se desarrollasen porque "actualmente la infraestructura vial del sector

no [es] suficiente para la cantidad de tránsito que circul[a] por ella". (Énfasis suprimido.) Petición de *certiorari*, pág. 4. A tenor con el Art. 9(b), *supra*, A.R.Pe. convocó vistas públicas con el propósito de dilucidar el impacto acumulativo en el tráfico vehicular que ocasionarían estos proyectos en el sistema vial del sector, a la luz de las deficiencias identificadas en las facilidades o mejoras públicas por la Junta de Planes y el Departamento de Transportación y Obras Públicas.

Por otro lado, A.R.Pe. claramente tenía autoridad para consolidar los casos y celebrar vistas públicas para considerar el efecto acumulativo de los proyectos sobre la infraestructura del área de la Avenida San Patricio. De lo contrario, tendría que evaluar fragmentadamente los distintos proyectos ante su consideración sin tomar en cuenta si el sector tenía las facilidades y mejoras públicas para atender el incremento en el uso de las vías públicas y en los estacionamientos causado por los proyectos una vez fuesen construidos.

Al determinar qué proyectos podían ser autorizados en ese sector, A.R.Pe. tenía el deber de considerar los problemas de tráfico que generarían los usos solicitados por los proponentes. Al haber más de una solicitud pendiente, correspondía a la agencia evaluar el impacto integral de los proyectos en cuestión sobre el tránsito vehicular del sector zonificado.

▪ Aunque cada uno de los proyectos fue sometido separadamente, esto no implica que A.R.Pe. tenía que considerar solamente los factores técnicos. Por virtud del mandato del Art. 9(b), *supra*, de su ley orgánica y del Art. 4 de la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. sec. 1124, A.R.Pe. también tiene que considerar los efectos primarios, secundarios y/o acumulativos que pueda tener la acción propuesta sobre la infraestructura y el ambiente del área.

▪ Al ejercer su facultad de expedir o denegar con-

sultas de ubicación o permisos de construcción y de usos de terreno, A.R.Pe. también tiene el mandato legislativo de velar porque no se otorguen en áreas cuyas carreteras no estén adecuadamente preparadas para atender el aumento en la demanda de servicio que se generará en cada sector zonificado. Véase *Anderson*, supra. Así también evita la desarticulación del sector y garantiza la planificación urbana tan necesaria en nuestras ciudades.

Del análisis anterior concluimos que A.R.Pe. actuó dentro del ámbito de su discreción al aplicar el Art. 9(b), *supra*, y examinar el impacto acumulativo de los proyectos sobre la infraestructura vial y el ambiente de ese sector.

## IV

En su petición A.R.Pe. también sostiene que el Tribunal Superior no aplicó correctamente la norma establecida para delimitar el alcance de revisión judicial de una decisión administrativa.

En el caso de autos, A.R.Pe. cumplió con el requisito estatutario del Art. 9(b), *supra*, de convocar a vistas públicas antes de decidir sobre los cinco (5) proyectos residenciales multipisos propuestos para el sector San Patricio. 23 L.P.R.A. sec. 71h. En el aviso de audiencia pública, A.R.Pe. informó que en la vista se evaluaría "el posible impacto acumulativo que pudieran causar los proyectos de referencia en el tránsito, estacionamiento e infraestructura vial del área". Anejo 8, pág. 179.

La vista se celebró durante aproximadamente diez (10) días y se recibió prueba testifical y documental. Posteriormente, los examinadores rindieron un extenso informe con conclusiones de hecho y derecho. Oportunamente el informe fue endosado por A.R.Pe.

Al revisar esta determinación de A.R.Pe., el alcance de la revisión del tribunal a quo estaba delimitado por la Sec. 4.5 de la Ley de Procedimiento Administrativo

Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175. Esta disposición requiere que los tribunales confirmen las determinaciones de hecho de una agencia administrativa si está sostenida por "evidencia sustancial que obra en el expediente administrativo". 3 L.P.R.A. sec. 2181. Esta disposición acoge estatutariamente la norma jurisprudencial de que, de ordinario, los tribunales no intervendrán con las determinaciones de hecho de un organismo administrativo si éstas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993).

Para que un tribunal pueda decidir que la evidencia en el expediente administrativo no es sustancial, es necesario que la parte afectada demuestre que existe "otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la ... prueba presentada ... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba" que tuvo ante su consideración. *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 686 (1953).

Además, tradicionalmente "hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto ...". *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975). Por esta razón, de ordinario, debemos ser cautelosos al intervenir con dichas determinaciones. *Fuertes y otros v. A.R.Pe.*, 134 D.P.R. 947 (1993); *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992).

En el caso de autos los proponentes impugnaron la decisión de A.R.Pe. sin cuestionar las determinaciones de hecho de los examinadores. De hecho, en su escrito ante nos,

Metropolitana S.E. esencialmente sostiene que A.R.Pe. violó su derecho al debido proceso de ley al requerirle que demostrara que su proyecto no habría de tener un impacto adverso sobre el tránsito vehicular. En vista de que los proponentes no demostraron ante el tribunal que en el expediente existía otra prueba que razonablemente redujera o menoscabara el peso de la evidencia suministrada por A.R.Pe., el Departamento de Obras Públicas y la Junta —hasta el punto de demostrar que A.R.Pe. actuó arbitrariamente— el foro de instancia no debió conceder el remedio solicitado. La decisión de A.R.Pe. estaba sostenida por evidencia sustancial y procedía que se denegara la expedición del recurso.

Por otro lado, contrario a lo que sostiene Metropolitana S.E., es obligación de aquella parte que solicita que la agencia considere una solicitud de un proyecto de construcción, poner a A.R.Pe. en condiciones de poder precisar qué repercusiones tendrían los proyectos propuestos sobre el problema previamente identificado por la agencia y presentar aquellas medidas que estime lo resolverían.

Sin embargo, una evaluación independiente de todos los documentos sometidos nos convence que las determinaciones de hecho de A.R.Pe. están ampliamente sostenidas por la prueba sometida en el caso. La agencia aplicó su experiencia y conocimiento a los hechos particulares de las solicitudes ante su consideración y las denegó. Procede confirmar su dictamen.

Sin embargo, esta decisión no impide que cualquiera de los proponentes modifique su proyecto e incluya medidas específicas adicionales para mitigar o evitar el impacto adverso que originalmente dio lugar al rechazo de A.R.Pe.

## V

■ Por último, somos conscientes que el Art. 9(b), *supra*, expresamente dispone que una denegación de un permiso, cuando el sector presenta características tan especiales que hacen impracticables el uso propuesto, es una decisión que puede ser posteriormente reconsiderada cuando dejen de existir "las condiciones desfavorables". 23 L.P.R.A. sec. 71h(b). Como han transcurrido varios años desde la decisión original de A.R.Pe. y es posible que hayan ocurrido unos cambios en las condiciones que dieron lugar al rechazo de los proyectos de autos, cualquiera de los proponentes originales o cualquier otra persona puede someter una nueva solicitud que tome en consideración las nuevas circunstancias e incluya medidas específicas para asegurar que el proyecto pueda llevarse a cabo en esa área.

Por las razones anteriormente expuestas, *procede la revocación de la sentencia recurrida del Tribunal Superior.*

*Se dictará la sentencia correspondiente.*