# 2004 DTA 143

### TRIBUNAL DE CIRCUITO DE APELACIONES
### REGIÓN JUDICIAL DE SAN JUAN, PANEL III

MARIANCIS MORENO VAZQUEZ Y JOSE B. FERNÁNDEZ CONTADOR
Querellantes-Recurridos

v.

CARIBE OUTLET DE CAROLINA, SUBSIDIARIA DE CARIBE AUTO GROUP Y
FORD MOTOR COMPANY OF PUERTO RICO
Querellados-Recurrentes

Núm. KLRA-2003-00500

San Juan, Puerto Rico, a 14 de septiembre de 2004

Panel integrado por su Presidente, el Juez Ortiz Carrión,
y los Jueces Negroni Cintrón y González Vargas

González Vargas, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante este Tribunal la recurrente, Ford Motor Credit Company of Puerto Rico, Inc. (en adelante, Ford Credit), quien solicita que revisemos y revoquemos una Resolución emitida por el Departamento de Asuntos del Consumidor (en adelante, D.A.C.O.) en favor de los recurridos Mariancis Moreno Vázquez y José B. Fernández Contador. Mediante dicha Resolución, concluyó el D.A.C.O. que Ford Credit era responsable solidariamente con el distribuidor Caribe Outlet, ante los querellantes y ordenó devolverles a éstos cierta cantidad de dinero por concepto de la compra de un vehículo, cuya transacción fue declarada nula.

### I

Surge de autos que el 17 de noviembre de 2001, los recurridos se personaron a las instalaciones de Caribe Outlet con la intención de comprar un automóvil. Una vez en dicho lugar, éstos fueron atendidos por un vendedor de nombre José García, quien le mostró el vehículo que a ellos le interesaba. A preguntas de los recurridos sobre las condiciones del mismo, el Sr. García respondió que el vehículo se encontraba en buenas condiciones. Posteriormente, en compañía del vendedor, los recurridos probaron la unidad alrededor de la manzana.

Así las cosas, los esposos recurridos adquirieron ese mismo día el vehículo marca Ford, Modelo Explorer, del año 1998, en virtud de un contrato de compraventa a plazos. Por ser dicho automóvil uno usado, se le concedió una garantía de tres (3) meses o tres mil millas (3,000), lo que ocurriera primero. El precio pagado por la unidad fue de $16,802.00, más los costos de arbitrios, título de propiedad y otros, para un total final de $17,400.00. Los recurridos desembolsaron $1,400.00 como pronto pago, y el balance restante fue financiado por la recurrente Ford Credit.

Al día siguiente de la compra, el 18 de noviembre de 2001, los recurridos se percataron de que el vehículo confrontaba problemas de ruido y *"chimeo"* en el tren delantero, que el acondicionador de aire no funcionaba apropiadamente, que el espejo eléctrico lateral estaba dañado, que una de las bocinas estaba inservible y que la

perilla de la antena estaba partida. Ese mismo día llevaron la unidad a Caribe Outlet y le informaron al vendedor José García sobre los desperfectos antes mencionados. La vendedora aceptó la guagua para reparación y en su lugar prestó a éstos otro automóvil, para que lo utilizaran mientras corregían los desperfectos del auto recién comprado.

A los tres días de haber entregado la unidad para el arreglo, el vendedor José García llamó a los recurridos para indicarle que la misma estaba reparada y que pasaran a recogerla. El recurrido José Fernández fue a recoger el vehículo supuestamente reparado. A pesar de los tres días en reparación, al salir del "*dealer*", el recurrido notó que el vehículo continuaba con los mismos ruidos y defectos, excepto el espejo eléctrico, el cual había sido arreglado. Por tal razón, al día siguiente, éste regresó a Caribe Outlet y entregó nuevamente el vehículo para las mismas reparaciones. En esta segunda ocasión, el vendedor José García le informó por primera vez que enviaría la guagua para unas campañas que se estaban realizando para ese tipo de unidad por el manufacturero, debido a que estaban confrontando problemas con el tren delantero. Así las cosas, los recurridos dejaron la guagua arreglando y por segunda vez le prestaron otro vehículo.

Transcurrida más de una semana desde que éstos dejaran la guagua reparando y sin recibir noticias del "*dealer*", el 30 de noviembre de 2001, los recurridos se personaron a Caribe Outlet con el propósito de cancelar el contrato de compraventa. En esta ocasión, además de hablar con el vendedor José García, se comunicaron con el gerente Milton Albert, quien según surge de autos, les informó que la compraventa podía cancelarse con $14,000.00. Tomando en cuenta los $1,400.00 que entregaron de pronto, la diferencia para la cancelación sería alrededor de $600.00. No obstante lo anterior, el Sr. Albert instruyó al vendedor José García para que hiciera las gestiones correspondientes dirigidas a obtener el total final de cancelación del contrato y que luego llamara a los recurridos para darle la información final. Los recurridos entregaron la unidad que le fue prestada y se marcharon. Surge, además, de los autos, ▉ que el gerente le informó a los recurridos que ya la guagua estaba arreglada, pero que no se encontraba en las inmediaciones de Caribe Outlet. Desde entonces y durante el proceso de la reclamación, el vehículo permaneció bajo la custodia del vendedor. Al momento de la vista, sin embargo, se desconocía su paradero.

Entre tanto, el personal del "*dealer*" tardó en comunicarse con los recurridos por varios meses, y cuando finalmente lo hicieron, le informaron a éstos que tenían que aportar una cantidad aproximada de siete mil dólares sobre el valor previamente comunicado para cancelar la transacción. Los esposos recurridos se negaron a pagar dicha cantidad, puesto que originalmente le habían hablado de una cifra mucho menor, reafirmándose así en lo anteriormente conversado.

Como parte de las acciones tomadas por los recurridos, el 13 de diciembre de 2001, enviaron una carta por correo certificado a la Ford Credit, informándole de la gestión realizada en Caribe Outlet dirigida a cancelar el contrato de compraventa. Dicha comunicación no fue contestada por el "*dealer*" ni por la recurrente Ford Credit. En vista de que al 22 de enero de 2002 no habían recibido respuesta a la misiva anterior, los recurridos, esta vez por conducto de su representación legal, remitieron sendas cartas por correo certificado y acuse de recibo a Caribe Outlet y Ford Credit. En la misma reiteraron su posición sobre la cancelación del contrato y les apercibió que de no recibir contestación de parte de ellos al 31 de enero de 2002, radicarían una querella ante el D.A.C.O.

Las gestiones de los recurridos no rindieron fruto, por lo que el 1 de marzo de 2002 presentaron la querella ante el D.A.C.O. Caribe Outlet presentó su contestación a la misma el 9 de mayo de 2002 y la recurrente Ford Credit presentó la suya el 14 de mayo de 2002. El D.A.C.O. celebró la vista en su fondo el 13 de enero de 2003. Al momento de la misma los recurridos habían efectuado pagos a la Ford Credit hasta el mes de diciembre de 2002, para un total de 13 mensualidades, a pesar de que no estaban en posesión del vehículo. Luego de celebrada la vista adjudicativa, D.A.C.O. emitió Resolución el 20 de febrero de 2003 y la notificó a las partes el 25 de febrero de 2003. Mediante dicha Resolución, declaró ha lugar la querella y concluyó que según la Ley de

Ventas a Plazos y Compañías de Financiamiento, 10 L.P.R.A.§ 731 *et seq.*, el vendedor y la institución financiera respondían solidariamente por la reclamación, en vista de lo cual les ordenó reembolsarle a los recurridos el pronto pago de $1,400.00, así como todas las mensualidades pagadas por éstos, más el interés legal prevaleciente sobre dichas cantidades. El 17 de marzo de 2003, la recurrente Ford Credit presentó Reconsideración ante la Agencia, la cual fue acogida. Los recurridos, por su parte, presentaron su oposición el 7 de abril de 2003. Oportunamente, D.A.C.O. emitió una Resolución en reconsideración el 13 de junio de 2003 en la que ratificó lo decidido en la Resolución original.

Inconforme con el dictamen anterior, el 14 de julio de 2003, Ford Credit presentó ante este Tribunal recurso de Revisión Administrativa en el que alegó los siguientes señalamientos de error:

"A. *La Resolución Administrativa y la Resolución de Reconsideración no están sostenidas por evidencia sustancial, por lo que, bajo la jurisprudencia aplicable, el D.A.C.O. cometió error de Derecho.*

B. *Erró el D.A.C.O. como cuestión de Derecho, al decretar la anulación del Contrato, debido a que no están presentes en este caso las condiciones necesarias para sostener la conclusión de la agencia que hubo un error suficiente para viciar el consentimiento prestado por los recurridos al suscribir el Contrato.*"

Simultáneamente con al presentación del recurso apelativo, Ford Credit presentó también una moción en la que solicitó que le ordenáramos al D.A.C.O. transcribir la vista adjudicativa celebrada el 14 de enero de 2003. El 3 de febrero de 2004 y notificada el 11 de febrero del mismo año, este Tribunal emitió Resolución, en la que le concedió al D.A.C.O. 10 días para que se expresara sobre la solicitud de transcripción de la prueba presentada por Ford Credit. El 17 de febrero de 2004 compareció el D.A.C.O. ante este Foro mediante moción en cumplimiento de orden, arguyendo que no había recibido copia del recurso incoado, ni de la moción relativa a la transcripción, por lo que no podía expresarse sobre la misma. El 19 de febrero de 2004 y notificada el 26 de febrero del mismo año, ordenamos a la recurrente Ford Credit que acreditara la notificación del recurso al D.A. C.O. En cumplimiento de lo anterior, el 3 de marzo de 2004, Ford Credit presentó copia de un acuse de recibo firmado, con el fin de acreditar la notificación requerida, lo cual fue posteriormente reconocido por el D.A.C.O. Así las cosas y luego de varios trámites interlocutorios, el 22 de junio de 2004 recibimos la transcripción solicitada.

Con el beneficio de la transcripción de la vista adjudicativa celebrada, así como el recurso presentado y sus apéndices, procedemos a resolver.

## II

La función revisora de las decisiones administrativas concedida a los tribunales apelativos consiste esencialmente en determinar si la actuación de la agencia fue dictada dentro de las facultades que le fueron conferidas por ley y si la misma es legal y razonable. *T-JAC v. Caguas Centrum*, 148 D.P.R. 70 (1999). Nuestro Tribunal Supremo en el caso de *Municipio de San Juan v. Junta de Calidad Ambiental*, **2000 J.T.S. 193** (2000), expresó que: "*[. . .] la revisión judicial de las determinaciones de las agencias administrativas comprende: (1) la concesión del remedio apropiado; (2) la revisión de las determinaciones de hecho de acuerdo al criterio de evidencia sustancial; y (3) la revisión completa y absoluta de las conclusiones de derecho.*" Véase, además, Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme,* sec. 9.3, pág. 521 (1993).

Por su parte, la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A., sec. 2101, *et seq.*, en su sección 4.5, limita el alcance de la revisión judicial de las decisiones administrativas. La misma dispone que las determinaciones de hechos de las agencias serán sostenidas por el Tribunal, si se basan en evidencia sustancial que obre en el expediente administrativo. Esta directriz recoge estatutariamente la norma jurisprudencial que establece que, de ordinario, los tribunales no deben intervenir con las determinaciones de hechos de un

organismo administrativo si éstas se apoyan en prueba suficiente que surja del récord administrativo considerado en su totalidad. *Metropolitana, S.E. v. A.R.P.E.*, 138 D.P.R. 200, 213 (1995); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521, 532 (1993); *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151, 154 (1973). El propósito de la regla de evidencia sustancial aplicable a las determinaciones de hechos es "*evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor*". *Reyes Salcedo v. Policía de Puerto Rico*, 143 D.P.R. 85 (1987), pág. 95. Se considerará evidencia sustancial aquella prueba que una mente razonable pueda aceptar como adecuada para sostener una conclusión. *Asoc. Vec. H. San Jorge v. U. Med. Corp.* 150 D.P.R. 70, **2000 J.T.S. 21**, pág. 561; *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999).

No obstante, las conclusiones de derecho serán revisables en todos sus aspectos. 3 L.P.R.A. § 2175. Esto no significa que los tribunales puedan descartar liberalmente las conclusiones de derecho de una agencia administrativa. *P.R.T.C. v. J. Reg. Tel. de P.R.*, *supra*. Por el contrario, los tribunales deben brindar deferencia a las interpretaciones que las agencias administrativas hacen de las leyes cuya administración le fue encomendada por la legislatura, y de las normas jurisprudenciales y reglamentarias aplicables. Ello en función del conocimiento especializado que la agencia posee en los asuntos o materias que le fueron delegados. *Rivera Rentas v. A &.C Development Corp*, 144 D.P.R. 450 (1997), *Reyes Salcedo v. Policía de P.R.*, *supra*, págs. 109-110. Esta deferencia judicial al *expertise* administrativo, sin embargo, cede ante una actuación irrazonable, ilegal o arbitraria. *Asoc. Vec. H. San Jorge v. U. Med. Corp*, *supra*, pág. 76. Esto por imperativo del debido proceso de ley que exige llevar a cabo un proceso justo y equitativo al intervenir con el interés propietario de una persona. *López Santos v. Asoc. de Taxis de Cayey*, 142 D.P.R. 109 (1996).

Así pues, una vez estudiado el expediente en su totalidad, si las determinaciones de hechos son razonables y están sostenidas por evidencia sustancial, los tribunales, de ordinario, deben sostener la apreciación de la prueba y el criterio de la agencia y evitar sustituirlo por el suyo. *Associated Insurance v. Comisionado de Seguros*, 144 D.P.R. 425 (1997). Por el contrario, si el tribunal luego de un análisis ponderado descubre que se infringieron valores constitucionales o la actuación administrativa fue arbitraria o irrazonable, puede sustituir el criterio de la agencia por el suyo y revocar el dictamen administrativo. *Pérez Vélez v. VPH Motors Corp*, **2000 J.T.S. 177** (2000).

Con el beneficio del trasfondo doctrinal antes expuesto, procedemos a disponer de la controversia planteada.

### III

Este Tribunal leyó cuidadosamente la transcripción de la vista adjudicativa y estudió el recurso de revisión presentado por el recurrente, con sus respectivos apéndices, particularmente la Resolución recurrida. De la transcripción de la vista se desprende que todas las partes tuvieron oportunidad de someter evidencia documental en apoyo de sus respectivas alegaciones, así como la oportunidad de presentar testigos e interrogarlos, aunque la parte recurrente optó por no presentar testigos en su favor.

Todo lo anterior nos permite concluir que el D.A.C.O. tuvo ante sí suficiente evidencia sobre lo cual fundamentar su dictamen. Las determinaciones de hechos están sostenidas por evidencia sustancial, por lo que, como cuestión de derecho, debemos abstenernos de intervenir con las mismas, y menos aún sustituir nuestro criterio por el de la agencia, que tuvo la oportunidad de aquilatar la prueba con el beneficio de una vista evidenciaria. No hemos identificado en el expediente otra evidencia de mayor valor probatorio capaz de superar la calidad de la prueba sobre la que descansó la agencia en su dictamen. *Misión Industrial de P.R. v. J.P.*, 146 D.P.R. 64 (1998), *Metropolitana S.E. v. A.R.P.E*, 138 D.P.R. 200 (1995). No hay duda de que el relato de los hechos declarados por los recurridos en la vista les mereció credibilidad al D.A.C.O., al extremo de que a su juicio se configuraba un vicio en el consentimiento prestado por error, capaz de anular la transacción. La determinación de la agencia está apoyada en suficiente evidencia que tuvo ésta ante sí, por lo que el primer error

alegado no se cometió.

En cuanto al segundo error, es menester comenzar por señalar que no surge de los autos que los recurridos sean personas expertas en mecánica automotriz. Conforme acontecieron los hechos en este caso, entendemos que los recurridos actuaron de forma diligente dentro de sus particulares circunstancias. Éstos preguntaron al vendedor sobre el estado del vehículo y confiaron en su palabra, puesto que éste tiene la obligación legal de proveer información completa y certera a los interesados sobre las condiciones del mismo, particularmente lo relativo a campañas del fabricante por defectos de fabrica. ■

La recurrente, por su parte, amparada en que los recurridos probaron la unidad alrededor de la manzana antes de comprarla, sugiere que éstos tuvieron oportunidad suficiente para conocer de los defectos de los que adolecía. Sin embargo, a dicha acción no puede adscribírsele el efecto que la recurrente pretende. Del record del caso surge que los compradores conocieron realmente los defectos del vehículo luego de comprarlo, al llevarlo a su casa. Es evidente, que bien por su falta de pericia o por lo breve del trayecto recorrido en la prueba, éstos no se percataron de los defectos previo a su compra. Es particularmente claro que los compradores no conocieron sobre la campaña del fabricante hasta la segunda ocasión que llevan el vehículo para reparación.

De otra parte, surge palmariamente del expediente el hecho de la diligencia desplegada por los compradores en formular sus reclamos al "dealer". Ellos devolvieron para reparación el vehículo el día siguiente de su compra, tan pronto se percataron de los defectos. Pacientemente, lo llevaron en una segunda ocasión, a pesar de que se trataba de los mismos defectos que se supone hubieran sido ya corregidos. Esta reparación se extendió irrazonablemente, al extremo de que al reclamar los compradores dejar sin efecto la transacción, el vehículo no se encontraba en el "dealer", aunque le representaban que el mismo estaba reparado. Además, desde el momento de su compra hasta que se reclama la nulidad de la transacción, los compradores estuvieron privados del uso y disfrute del vehículo. Más aún, estuvieron pagando las mensualidades durante el trámite administrativo, sin tener bajo su posesión y control el vehículo. ■

La prueba no controvertida que tuvo ante sí el D.A.C.O. fue a los efectos de que de haber conocido los recurridos los defectos del vehículo, sobretodo el defecto que provocó la campaña del fabricante, no lo hubieran comprado. Sobre esa base y la totalidad de los eventos previos y posteriores a la transacción, particularmente la representación del "dealer" de que se habría de proceder a dejar sin efecto la compraventa, proveyeron suficientes fundamentos al D.A.C.O. para decretar la nulidad de la transacción. No se trata por tanto de una decisión arbitraria, irrazonable o carente de suficiente y sustancial evidencia en apoyo de la misma.

Indudablemente, el D.A.C.O. estuvo en mejor posición de evaluar la prueba que le fue presentada y de adjudicarle el valor probatorio correspondiente, por lo que la decisión emitida en este caso merece por ello y por el conocimiento especializado de la agencia, deferencia de este Foro. En ausencia de prueba que nos permita concluir que el D.A.C.O. actuó de forma ilegal, irrazonable o arbitraria, debemos abstenernos de intervenir con la decisión emitida por dicha agencia administrativa.

**IV**

Por los fundamentos antes expuestos, se deniega expedir el recurso presentado. Notifíquese.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria General. El Juez Negroni Cintrón disiente con opinión.

Aida Ileana Oquendo Graulau
Secretaria General

## ESCOLIOS 2004 DTA 143

**1.** Págs. 66 – 68 del apéndice.

**2.** Véase artículos 22 y 28 del Reglamento de Garantías de Vehículos de Motor, Núm. 4797 del 28 de septiembre de 1992 y enmendado por el Reglamento 5361 del 12 de enero de 1996.

**3.** Es importante tener presente que el vehículo después de la segunda reparación se mantuvo siempre bajo el control del *"dealer"*, el cual posteriormente cesó operaciones. Al momento de la vista se desconocía el paradero del vehículo. (Véase Resolución en Reconsideración del D.A.C.O, a la pág. 2).

## VOTO DISIDENTE DEL JUEZ NEGRONI CINTRÓN – 2004 DTA 143

San Juan, Puerto Rico, a 14 de septiembre de 2004

Disiento respetuosamente de la decisión de la mayoría. Expediría el auto solicitado para revocar la resolución recurrida. Estimo que los *"defectos"* que describe la evidencia presentada ante el Departamento de Asuntos del Consumidor (DACO) por la parte recurrida, no prueba la existencia de vicios ocultos de la seriedad que justificaría la resolución del contrato de compraventa del vehículo de motor objeto del dictamen recurrido o tan siquiera una acción *quanti minoris*. La mención, sin más, de que la Ford tenía una *"campaña"* en cuanto al modelo del vehículo adquirido por los recurridos, tampoco justifica la anulación del contrato de referencia por dolo o error, como dictaminó el DACO.

En fin, la evidencia sustancial en el record no avala la decisión recurrida, pues la prueba presentada era insuficiente para justificar la concesión del remedio concedido. Estimo que el record revela claramente que los recurridos actuaron apresuradamente, al grado de entregar el vehículo, sin que tan siquiera culminara la transacción que procuraban.

Antonio J. Negroni Cintrón
Juez de Apelaciones