Rivera Román, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
El señor Wilfredo Padua Ledesma nos solicita que revoquemos una resolución de la Junta de Síndicos de la Administración de los Sistemas de Retiro, (en adelante Junta) en la cual se le denegó una pensión por incapacidad ocupacional.
Por entender que no se cometió el error señalado, se confirma la resolución apelada.
*930 I
El señor Wilfredo Padua Ledesma trabajaba como Supervisor de Saneamiento, en el Área del Vertedero del Municipio de San Juan. El recurrente se desempeñó en el Servicio Público por más de 20 años, pero solamente cotizó para el Sistema de Retiro unos 9.5 años. Al momento de dictarse la resolución apelada, el señor Padua Ledesma tenía 57 años de edad, poseía cuarto año de Escuela Superior y un Curso de Computadoras de la Universidad del Sagrado Corazón.
El 9 de diciembre de 1988, el señor Padua Ledesma sufrió una caída en la cual se lastimó el lado izquierdo de la pelvis y la espalda. El accidente ocurrió en el curso de su trabajo. El señor Padua se reportó al Fondo de Seguro del Estado (en adelante el Fondo), en donde se le asignó el número 89-64-02579. Recibió un diagnóstico de Trauma Lumbosacral. El 13 de enero de 1989 se realizó un CT Scan y éste reveló que sufría una Herniación Discal (HNP L5 SI). Como resultado de estas condiciones, el Fondo determinó una incapacidad fisiológica de 20%. (Véase Apéndice, pág. 23). Posteriormente, el 16 de abril de 1992, la Comisión Industrial de Puerto Rico determinó aumentar la referida incapacidad a un 30%. (Véase Apéndice, pág. 24).
El 28 de febrero de 1995, el señor Padua Ledesma sufrió una segunda caída y se reportó al Fondo. En el caso le fue asignado el número 95-64-04409-7 y se determinó que sufría un 15% de incapacidad como resultado de una depresión mayor. (Véase Apéndice, pág. 25). Surge del expediente que el señor Padua Ledesma informó al fondo dos casos adicionales, a los cuales le fueron asignados los números 90-64-0455 y 94-64-05458 (ambos casos corresponden a la fecha del 22 de octubre de 1996). Como resultado de esos casos, el Fondo determinó que el recurrente sufría una incapacidad de 5% en el dedo gordo del pie derecho y de 10% en el dedo medio de la mano izquierda. (Véase Apéndice, págs. 26-27).
En 1994, el señor Padua Ledesma acudió ante la Administración de los Sistemas de Retiro (en adelante Administración) y solicitó una pensión por incapacidad ocupacional. Dicha solicitud fue denegada el 1 de septiembre de 1994. La Administración concluyó que el recurrente se encontraba "física y mentalmente capacitado para cumplir las funciones de su cargo". (Véase Apéndice, pág. 28). Inconforme con tal determinación, el señor Padua Ledesma presentó un escrito de apelación ante la Junta de Síndicos. Mediante resolución emitida el 3 de agosto de 1995, la Junta ordenó el archivo del caso sin perjuicio, ya que ante el Fondo se encontraban pendiente tres casos del recurrente, entre ellos el mencionado caso número 95-64-04409-7.
El 11 de septiembre de 1998, la Junta ordenó la reapertura del caso y devolvió el mismo a la Administración para que ésta realizara la evaluación de la condición emocional relacionada al caso número 95-64-04409-7. La Administración realizó la correspondiente evaluación, y el 30 de agosto de 1999, se reafirmó en la denegatoria de la pensión por incapacidad. (Véase Apéndice, pág. 43). El recurrente solicitó la reconsideración ante la Unidad de Reconsideraciones del Sistema de Retiro, la cual confirmó la determinación de la Administración a base de las recomendaciones contenidas en el Informe del Oficial Examinador. (Véase Apéndice, pág. 46).
El recurrente no estuvo de acuerdo con la determinación de la Unidad de Reconsideraciones, por lo que nuevamente recurrió en apelación ante la Junta de Síndicos. El 5 de febrero de 2004, la Junta emitió una resolución en la cual confirmó la determinación apelada.
En su resolución, la Junta de Síndicos incluyó el siguiente listado de la prueba médica evaluada por la Oficial Examinadora, Leda. Virgen M. Torres Díaz, el cual transcribimos a continuación.

“a. Expediente médico del Fondo del Seguro del Estado de ambos casos.

b. Lumbar Spine Magnetic Resonance realizado en el Radiology Institute of Imaging Center el 22 de mayo 
*931
de 1990, el cual reveló: "The examination shows minimal narrowing, and decreased T2 signal intensity of the L5-S1 interspace; compatible with degenerative changes in the corresponding disc. In addition, there is a small centrally herniated disc at L5 SI with no significant thecal sac compression. The neutral foramina and nerve roots are also free of encroachment. The other interspaces, vertebral bodies and conus medullaris show no abnormalities.

c. Evaluación médica realizada por el Dr. Israel Ganapolsky el lero de febrero de 1994 de la cual surge que el apelante no puede realizar sus funciones con efectividad y rapidez. Su probabilidad de recuperación es dudosa, tal vez poca o ninguna.

d. Informe médico cumplimentado por el Dr. Jaime Cruz Rivera, Médico Generalista del Fondo del Seguro del Estado, fechado el 29 de marzo de 1994, del cual surge: Restricciones necesarias en las actividades del paciente: Realizar ejercicio fuerte. Limitación de movimiento: Lumbar: Flexión 40 grados, FLDI 15 grados. Extensión: 10 grados. Incapacidad parcial permanente: 20% funciones fisiológicas generales. Prognosis: Reservado.

e. Cuestionario neurológico cumplim.entado por el Dr. Renato Sartori el 21 de marzo de 1994 del cual surge (sic) los siguientes hallazgos: Flexión lumbar 70 grados. "Lower back intermitent moderate to severe".

f. EMG - NCS of lower extremities of 10-11-94: "Above findings are compatible with Left S1-S2 radioculopaty".

g. Mental Impairment Report cumplimentado por el Dr. Guillermo Santiago el 10 de noviembre de 1994 del cual surgen los siguientes hallazgos: "Because of irritability and suspiciousness has poor intrafamiliar and interpersonal relations", motor activity slow quit (exhausted), coherent, irrelevant, low slow monotonous speech, affect inadecuate. Contents of thought: conflicts, persecution, aggressive in job, ideas of worthlessness; affect indifferent, mood depressed. Orientation: Yes in person and place, no in time. Memory immediate: poor: recent; fair; remote: fragmented. Intellectual functions: poor because of impaired (sic). Attention and concentration: very poor. No activities, does anything in job, no household, not use (sic) public transportation because of his referential ideas. Social functioning: no friends, many enemies, afraid of groups, does not initiate social contacts. Diagnosis: Major depression and psychotic traits, paranoid personality disorder. Prognosis: Guarded at 48. No ability to handle funds".

h. EMG — NCS of lower extremities of 1-17-95: "Above findings are compatible with a Right L4-L% Radioculopathy with some evidence of chronicity".

i. Lumbar Spine Magnetic Resonance realizado el 2-15-95 por el Radiology Institute Imagine Center del cual surge: "The L5-SI interspace shows a central posterior annulus bulge, without definite HNP or stenosis, or dural sac compression. The L5-S1 also shows decreased T2 signal intensity, compatible with degenerated disc. The other interspaces, vertebral bodies and conus mellaries are normal".

j. Cuestionario neurológico cumplimentado por el Dr. Renato Sartori el 5-3-99. Del cual surge fuerza muscular 4/5 en todas las extremidades. Los reflejos normales excepto disminución en los aquilanos. Flexión Lumbar 70 grados. Extensión 10 grados. Diagnóstico: Lumbar lateral HNP L5-S1. Prognosis: "Fair to guarded".

k. Evaluación social siquiátrica realizada por la Supervisora de Trabajo Social del Fondo, Sra. Aura A. González, el 1ro. de agosto de 1995, de la cual surge que el apelante ofrece un historial personal extenso y detallado. Menciona dos ascensos recibidos en su historial laboral. Acude solo a la entrevista. Tiene buena higiene. Viste adecuadamente. Está orientado y ofrece la información sin dificultad.

*932
l. Evaluación siquiátrica de la Dra. Natividad Rodríguez, efectuada el 8 de octubre de 1996 de la cual surgen los siguientes hallazgos: coherente, relevante y sin delirios. Estado anímico de tristeza, depresión. Afecto adecuado. Orientado x 3. Memoria adecuada, juicio conservado. Diagnóstico: Depresión mayor. Medicación: Prozac 20mg. Y dalmane 30mg. De la evaluación de incapacidad siquiátrica realizada por la Dra. Rodríguez surge: Inteligencia: Normal, Pensamiento: Leve, Percepción: Normal, Juicio: Normal, Afecto: Leve, Conducta: Normal. La Dra. Rodríguez recomendó una incapacidad de 15%.

m. Mental Impairment Evidence Report cumplimentado por el Dr. José Alonso el 16 de abril de 1999 del cual surgen los siguientes hallazgos: indica que examinó por primera vez al participante el 11 de febrero de 1995 y que continuó tratándolo cada dos meses (no ofrece fechas exactas). Reporta la última visita el 10 de marzo de 1999. El examen mental es escaso en datos objetivos para poderse evaluar. DX: Depresión mayor severa recurrente con rasgos sicóticos (no documentados). Rx:Pasil 20mg. am, Restoril 30mg. hs, Xanax 0.25mg. bid y Haldol o.5mg. bid.

n. Mental Impairment Evidence Report cumplimentado por la Dra. Nilda García el 8 de abril de 2000 del cual surgen los siguientes hallazgos: Negó historial de violencia, pero sí se torna irritable y poco tolerante. Alega se refugia en la iglesia en la que está muy activo. En su trabajo se aislaba, se ausentaba mucho por su condición física, la productividad disminuyó y esto trajo problemas con su supervisor. Mental Status: Alerta, aseado, sobrepeso, cooperadpr y espontáneo. Mantiene contacto visual. Flow of thought: Lógico, coherente y relevante. Negó alucinaciones visuales o ideas suicidas. Ventila sentimientos de desesperanza y minusvalía. Manifiesta: "La gente no entiende esta enfermedad". Afecto: Apropiado. Mood: Triste. Orientado en las tres esferas. Memoria inmediata: Recordó 4 de 5 dígitos. Memoria reciente y remota: Conservadas. Funciones intelectuales: Adecuado. Juicio: Bueno aunque paciente con poca tolerancia a los estresores. Insight: Bueno. Atención/Concentración: Adecuada. Ve televisión, lee el periódico y sobre teología. Coge transporatación pública y va a Plaza las Américas. Asiste a la iglesia tres veces en semana, en grupo de solteros semanalmente (sic) que es parte de la iglesia. Es capellán pero no ejerce al momento. Concentración: Adecuado. Stress tolerance: Debido a la condición física se ausentaba mucho, tendía a irritarse y con (sic) anhedonia. Dx: Depresión mayor severa. Rx: Dalmane 30mg. hs, Paxil 20mg. d, relajante muscular: Buen cumplimiento. Prognosis: Reservada. Puede manejar sus bienes. ”
La Junta concluyó que ni de la evidencia médica presentada, ni del testimonio del señor Padua Ledesma, había quedado demostrado que éste se encontrara “imposibilitado de desempeñar cualquier cargo en el servicio del patrono”, confirmando así la denegatoria de la pensión por incapacidad ocupacional. Por estar en desacuerdo con la determinación de la Junta, el señor Padua Ledesma presentó el escrito ante nuestra consideración, en el cual le atribuye a dicho organismo la comisión del siguiente error:

“Cometió error de derecho la Junta de Síndicos de la Administración de los Sistemas de Retiro al resolver que la aquí parte recurrente no tiene derecho a la pensión por incapacidad ocupacional solicitada, al aplicar en su proceso adjudicativo de manera contraria a la ley y a la jurisprudencia vigente en lo concerniente al concepto médico-legal "incapacidad total permanente", criterios de suficiencia de prueba (Quántum de prueba), extremadamente onerosos de cumplir y que no son de aplicación en materia de pensiones a trabajadores ni en los procesos en que se adjudican derechos basados en leyes remediales a favor de estos. ”

Examinemos el derecho aplicable al caso que nos ocupa.
II
La Ley del Sistema de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico, Ley Núm. 447 del 15 de mayo de 1951, según enmendada, 3 L.P.R.A. sees. 761 et seq. es una ley general que provee beneficios de retiro para la gran mayoría de los empleados públicos y contiene varias modalidades de pensiones o anualidades por retiro. Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020, 1031 (1992).
*933 Uno de los derechos concedidos por la Ley 447, supra, es la anualidad por incapacidad ocupacional. La Ley 447, supra, dispone que todo participante del sistema de retiro que quede incapacitado para el servicio público a raíz de una condición que se origine por causa del empleo y surja en el curso del mismo, tendrá derecho a recibir una anualidad por incapacidad ocupacional. 3 L.P.R.A. see. 769. Dispone la referida sección que el participante tendrá derecho a la anualidad, siempre que "se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador". 3 L.P.R.A. see. 769. 
El Reglamento General del Sistema de Retiro y de los Empleados del Gobiemo.de Puerto Rico y sus Instrumentalidades para la Concesión de Pensiones, Beneficios y Derechos a los Empleados del Gobierno de Puerto Rico (en adelante Reglamento) y sus Instrumentalidades, Reglamento 4930 del 25 de junio de 1993, establece lo siguiente respecto a la evidencia médica requerida para la con'cesión de pensiones por incapacidad ocupacional:

“Si la evidencia médica que consta en el expediente y conforme al listado de criterios médicos ("Adult Listings”) establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre la incapacidad y someterá su recomendación al Administrador. Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que su patrono le hubiere asignado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que esté percibiendo.... (Regla 24.4)”

Como vemos, la disposición reglamentaria antes citada, incorpora por referencia el Apéndice I (Adult Listings) aprobado bajo las disposiciones del Título II de la Ley Federal de Seguridad Social (Social Security Regulations: Rules for Determining Disability), 20 C.F.R. 404 Subparí P. No obstante, en el Reglamento no se adoptaron los criterios médicos vocacionales establecidos en el Apéndice II de la reglamentación del Seguro Social Federal. De manera que, bajo el ordenamiento de Puerto Rico, los criterios vocacionales no son considerados al evaluar la incapacidad.
La Ley 447, supra, y el Reglamento 4930, supra, condicionan la concesión de una pensión de retiro por incapacidad a que el solicitante se encuentre total y permanentemente incapacitado para realizar cualquier trabajo remunerativo; esto es, un trabajo cuyo sueldo equivalga a una cantidad más o menos igual a la que el solicitante se encuentre recibiendo. La pensión no cobija una incapacidad leve que limite las funciones de un empleado, pero que no le impide llevar a cabo las funciones de su trabajo o de cualquier otro empleo remunerativo. Sánchez v. A.S.R.E.G.J., 116 D.P.R. 372, 376 (1983).
El Tribunal Supremo de Puerto Rico ha indicado en varias ocasiones que las leyes que crean derechos al disfrute de pensiones se deben interpretar liberalmente a favor del beneficiario a fin de que se cumpla el propósito reparador para las cuales fueron aprobadas. Calderón v. Adm. Sistemas de Retiro, supra, 1034 (1992); Morales v. Adm. Sistemas de Retiro, 123 D.P.R. 589 (1989); Sánchez v. A.S.R.E.G.J., 116 D.P.R. 372 (1985).
Examinemos los planteamientos del recurrente a la luz del derecho positivo aplicable.
III
En su primer y único señalamiento de error, el recurrente arguye que la Junta de Síndicos, al denegar su solicitud de pensión por incapacidad ocupacional, aplicó un estándar de prueba más exigente que el permitido *934 en el ámbito del derecho administrativo.
El señor Padua Ledesma señala que en el expediente administrativo existe prueba "suficiente" para llegar a la conclusión de que éste se encuentra incapacitado para trabajar. De otra parte, indica que la prueba contenida en el expediente administrativo "no sostiene sin lugar a dudas que el recurrente está capacitado para [realizar] actividades remunerativas de manera sostenida, continua e ininterrumpida". Señala además que "existe suficiencia en la prueba para sostener el genuino reclamo del aquí recurrente". Los planteamientos del señor Padua Ledesma resultan inmeritorios, pues contradicen reiteradas doctrinas de derecho administrativo. Veamos.
Es un principio cardinal de derecho administrativo que las determinaciones de hechos de una agencia serán sostenidas por los tribunales si están sustentadas con evidencia sustancial que obre en el expediente administrativo. Metropolitana, S.E. v. A.R.P.E., 138 D.P.R. 200, 213 (1995); Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521, 532 (1993); Rodrigo v. Tribunal Superior, 101 D.P.R. 151, 154 (1973). El propósito de la regla de evidencia sustancial es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor". Reyes Salcedo v. Policía de Puerto Rico, 143 D.P.R. 85, 95 (1997).
En ese sentido, los Tribunales estamos impedidos de intervenir con las determinaciones de hechos de una agencia administrativa cuando éstas se hallan fundamentadas en prueba que surja del expediente. P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. _, 2000 J.T.S. 98; Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881, (1999). A tenor con esa concepción, las determinaciones de hechos de una agencia serán respetadas si descansan en una base racional, aun si el tribunal hubiese preferido que se llegase a otra conclusión. Demetrio Fernández, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Colombia, Editorial Forum, 2001, pág. 543.
Los principios antes esbozados derrotan los argumentos del recurrente. La función revisora de los tribunales en cuanto a las determinaciones de hechos de las agencias administrativas es una función limitada.
Correspondía al señor Padua Ledesma demostrar que existe prueba en el expediente que menoscaba o reduce el valor probatorio de la evidencia en que la Junta basó sus determinaciones de hechos, hasta el punto que sea forzoso concluir que la determinación de la agencia fue irrazonable. Ver Misión Ind. de P.R. v. J.P., 146 D.P.R. 64 (1998); Metropolitana S.E. v. A.R.P.E., supra.
La Junta de Síndicos, en su resolución, concluyó que el apelante no sufría de deficiencias neurológicas, el cual es uno de los criterios a considerarse de acuerdo a los listados utilizados por la Administración en cuanto a las condiciones orgánicas. Del informe médico preparado por el Dr. Jaime Cruz Rivera, surge que el señor Padua Ledesma no presenta daños neurológicos. (Véase Apéndice a "Oposición", pág. 2). A igual conclusión llegó el Dr. Renato Sartori, quien preparó un cuestionario neurológico. (Véase Apéndice a "Oposición", pág. 4). Aunque el señor Padua Ledesma presenta una serie de limitaciones en cuanto a su condición orgánica, las mismas no cumplen con los requisitos para recibir una pensión por incapacidad ocupacional.
La evidencia médica presentada en cuanto a la condición emocional del señor Padua Ledesma sustenta la conclusión de la Junta. De la evaluación siquiátrica realizada por la Dra. Nilda García surge que el apelante se encuentra orientado en las tres esferas, su pensamiento es lógico, coherente y relevante. Señala además la Dra. García que sus funciones intelectuales son adecuadas y tiene buen juicio. (Véase Apéndice a "Oposición", págs. 30-34). De otra parte, de la revisión del expediente siquiátrico realizada por el Dr. Manuel J. Colón Vargas, se desprende que los síntomas del apelante no llenan o igualan los criterios del “listing” 12.03, 12.04 y 12.06. (Véase Apéndice a "Oposición", pág. 35). Concluyó la Junta de Síndicos que a pesar de encontrarse deprimido, el señor Padua Ledesma no se encuentra incapacitado mentalmente.
*935 Hemos examinado el expediente, y entendemos que la determinación de la Junta de Síndicos de denegar la pensión solicitada descansa debidamente en evidencia sustancial que surge del expediente. De la prueba médica que tuvo ante sí la Oficial Examinadora que atendió el caso, no se desprende que el señor Padua Ledesma se encuentre incapacitado para cumplir con los deberes de cualquier trabajo remunerado.
La conclusión de la Junta se presume correcta y nos merece gran deferencia. Ante la ausencia de evidencia que menoscabe dicha conclusión y que demuestre que la agencia actuó arbitraria o ilegalmente, o de manera tan irrazonable que su actuación haya constituido un abuso de discreción, nos encontramos impedidos de intervenir con la misma.
IV
Por los fundamentos antes expuestos, se confirma la resolución apelada.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General Interina.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIO 2005 DTA 31
1. La Regla 24.2 del Reglamento General del Sistema de Retiro, supra, condiciona el derecho a obtener una pensión por incapacidad ocupacional al cumplimiento con los siguientes requisitos: "(a) que el participante esté en servicio a la fecha de la radicación de la solicitud; (h) que se reciba suficiente prueba médica en cuanto a la incapacidad mental o física del participante; (c) que el Fondo del Seguro del Estado haya determinado que la condición incapacitante está relacionada con el empleo del participante y es compensable; (d) que el participante o su patrono notifique dicha incapacidad por escrito al Administrador, dentro de los seis meses siguientes a la fecha en que el Fondo del Seguro del Estado haya determinado que la condición incapacitante está relacionada con el empleo del participante. ”