# 2006 DTA 128

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL III**

ANTONIO J. MATTEI PACHECO
Recurrido

v.

MAR DEL NORTE, S.E., UNITED SURETY &
INDEMNITY Y FLUOR DANIEL CARIBBEAN, INC.
Recurrente

Núm. KLRA-04-01003

San Juan, Puerto Rico, a 24 de octubre de 2006

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
y los Jueces Aponte Hernández y Morales Rodríguez

Bajandas Vélez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

 Comparece ante nos Fluor Daniel Caribbean, Inc. (Fluor Daniel o la recurrente) y nos solicita que revoquemos la resolución emitida y notificada por el Departamento de Asuntos del Consumidor (el DACO o la agencia) el 6 de octubre de 2004. Mediante la misma, el DACO ordenó a la recurrente y a Mar del Norte, S.E. que solidariamente corrigieran las filtraciones en el techo del apartamento del señor Antonio Mattei (el señor

Mattei o el recurrido). Además, dispuso que debían utilizar el método de reparación propuesto por el perito del recurrido, el ingeniero Juan G. Solivan (ingeniero Solivan), el cual requería corregir la membrana estructural del techo del referido inmueble.

Examinados minuciosamente los escritos de las partes, los documentos que obran en los apéndices, la transcripción de la vista celebrada y el derecho aplicable, resolvemos revocar la resolución recurrida.

## I

El 10 de abril de 2001, el señor Mattei presentó ante el DACO una querella ■ en contra de Fluor Daniel, Mar del Norte S.E. y United Surety & Indemnity, Co. Alegó que el 31 de mayo de 2000 adquirió el apartamento número 704 en Carrion Court Playa Condominium. Expresó que en dicho apartamento existían filtraciones en el techo de la cocina, el balcón, la sala-comedor y las habitaciones. ■ Arguyó que, a pesar de que Fluor Daniel intentó corregir las referidas filtraciones, dichas gestiones solamente surtieron efecto en algunas áreas del techo. Por tal razón, requirió que se corrigieran los mencionados defectos desde el exterior del apartamento. ■

Se desprende de las determinaciones de hechos de la resolución recurrida, que Fluor Daniel efectuó la primera reparación del apartamento por la parte superior del techo mediante la remoción de losetas y la aplicación de una membrana impermeabilizadora. También surge como conclusión del DACO que, tiempo después, se hicieron varios intentos de reparación mediante inyección desde el interior del apartamento. Asimismo, la agencia determinó que ante ulterior reclamo del recurrido, Fluor Daniel intentó arreglar las filtraciones mediante las mencionadas inyecciones y que el recurrido en esta ocasión no permitió que se reparara el techo desde el interior de su apartamento y exigió que se corrigiera el defecto por la parte exterior del inmueble.

Así las cosas, y debido a las discrepancias surgidas respecto al método de reparación, el recurrido presentó la mencionada querella ante el DACO.

Luego de varios trámites procesales, la vista administrativa se celebró los días 20 de mayo y 13 de junio de 2003. La prueba desfilada por la parte recurrida consistió en su propio testimonio y el de su perito, el ingeniero Solivan. Por su parte, la recurrente presentó los testimonios periciales de los ingenieros Hermán Méndez, Arturo Mayol y José Antonio Sabat. Las partes también sometieron varios documentos como exhibits, tales como la escritura de compraventa del inmueble, informes periciales y diversas comunicaciones escritas, entre otros.

Sometidas las controversias, en resolución emitida y notificada el 6 de octubre de 2004, el DACO declaró ha lugar la querella incoada por el recurrido y condenó solidariamente a Mar del Norte S.E. y a Fluor Daniel, a que, dentro del plazo de 60 días a partir de la fecha de la notificación de la resolución, corrigieran en forma satisfactoria los defectos de filtración de agua en el techo del apartamento del señor Mattei. De este modo, resolvió que el método de reparación a utilizarse sería el indicado por el ingeniero Solivan en las recomendaciones que éste hiciera luego de su visita al apartamento objeto de la controversia. ■

Insatisfecha con el aludido dictamen, el 26 de octubre de 2004, Fluor Daniel presentó una moción de reconsideración. Aunque del recurso no se desprende la decisión de la agencia en torno a dicha moción, entendemos que el plazo dispuesto por la LPAU transcurrió sin que la agencia se expresara al respecto.

Inconforme con tal determinación, Fluor Daniel presentó ante nos el recurso de revisión de autos. Alega que el DACO cometió los siguientes errores, los cuales describió de la siguiente manera:

*"Primer error: Erró DACO en la apreciación de la prueba e incidió al concluir que la prueba demostró:*

*a. que el método de reparación propuesto por Fluor Daniel (de inyecciones de uretano) no es efectivo cuando existen roturas de la membrana impermeabilizadora que no coinciden con la grieta en la que se inyecta el compuesto de uretano;*

*b. que se hicieron varios intentos de reparación desde el interior del apartamento (mediante inyecciones de uretano) y que la última reparación en el apartamento fue en octubre de 2002; y*

*c. al no considerar la evidencia presentada sobre la efectividad del método de inyecciones de uretano en la reparación del apartamento 703, que presentaba problemas similares al apartamento 704.*

*Segundo error: La resolución de DACO conduce a la comisión de injusticias, mucho más cuando los querellados Fluor Daniel y Mar del Norte nunca se han rehusado a reparar; viola los derechos constitucionales fundamentales de los dueños del apartamento 801 y de los demás condóminos, pues interfiere con sus derechos a que no se les prive de la posesión de su propiedad, el uso y disfrute pacífico de las mismas y no determina la responsabilidad de United Surety Indemnity Co."*

Atendida la petición de revisión de epígrafe, ■ concedimos a la recurrida 30 días para que ésta fijara su posición, gestión que llevó a cabo oportunamente.

Con el beneficio de las posiciones de las partes, procedemos a resolver.

## II

Como es sabido, DACO es una agencia administrativa que se creó con el propósito primordial de vindicar e implementar los derechos del consumidor. *Rodríguez Dilán v. Guacoso Auto Corp.*, 166 D.P.R. __ (2005), **2005 J.T.S. 187**. A través del Artículo 5 de su Ley Habilitadora, 3 L.P.R.A. § 341d, la Asamblea Legislativa le transfirió a DACO las funciones y poderes de la antigua Administración de Servicios al Consumidor, 23 L.P.R.A. § 1001 *et seq.*, entre los cuales se encontraba la administración de la Ley de la Oficina del Oficial de Construcción. 23 L.P.R.A. § 1002.

El propósito que motivó la aprobación de la Ley Núm. 130 del 13 de junio de 1967, mejor conocida como la Ley de la Oficina del Oficial de Construcción (Ley de Construcción), 17 L.P.R.A. sec. 511 *et seq.*, fue reglamentar las actividades de urbanizadores y constructores que se dediquen al negocio de la construcción de viviendas, en todas las etapas, incluso la de venta de las viviendas. *United Fed. Savings v. DACO*, 111 D.P.R. 424, 426 (1981). En su Artículo 9, la referida ley dispone que incurrirá en una práctica indeseable en el negocio de la construcción de vivienda todo urbanizador o constructor que deje de corregir un defecto de construcción en una vivienda. 17 L.P.R.A. § 509. Asimismo, conforme al Artículo 11 de la Ley de Construcción, DACO será el organismo que tendrá jurisdicción para atender las querellas instadas al amparo de su jurisdicción; disponiendo además, que la acción para exigir responsabilidad por vicios o defectos de construcción caducará a los dos (2) años del otorgamiento de la escritura de compraventa. 17 L.P.R.A. § 511.

Al tenor de las facultades antes mencionadas, DACO aprobó el *"Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico"*, Reglamento Núm. 2268 de 16 de septiembre de 1977 (Reglamento de Construcción), en el que establece las reglas a seguir respecto a las prácticas indeseables en el negocio de la construcción y los términos para reclamar en caso de vicios o defectos de construcción. En lo pertinente, dicho reglamento dispone en su sección 10 que incurrirá en práctica indeseable en el negocio de la construcción de vivienda todo urbanizador o constructor que, entre otras cosas, deje de corregir cualesquiera de los defectos que el Reglamento de Construcción enumera o cualquier otra anormalidad que no se encuentre enumerada. El Reglamento de Construcción ordena, por otra parte, que los defectos de construcción para los cuales no se especifique un término dentro del cual deberá notificarse al urbanizador o constructor, se le aplicará un término de notificación de dos (2) años.

Por otro lado, la facultad revisora de los tribunales a las decisiones emitidas por una agencia administrativa es limitada. *"El alcance de la revisión judicial comprende tres áreas. Ellas son: (1) Concesión del remedio apropiado, (2) Revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial, y (3) Revisión completa y absoluta de las conclusiones de derecho"*. Fernández Quiñónes, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da. ed., Bogotá, Forum, 2001, pág. 534.

La función revisora del tribunal, aunque restringida, tiene como propósito fundamental el delimitar la discreción de los organismos administrativos, además de velar porque sus actuaciones sean conformes a la ley y dentro del marco del poder delegado. *T-JAC Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998); *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656 (1997).

Este ejercicio por parte del tribunal está enmarcado en dos principios esenciales que postula la Ley Núm. 170 de 12 de agosto de 1988, conocida como Ley de Procedimiento Administrativo Uniforme (en adelante, L.P. A.U.). 3 L.P.R.A. § 2101 *et. seq*. *"Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo"*. 3 L.P. R.A. §2175. Sin embargo, *"[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal."* *Id.* Es, por tanto, indispensable que la agencia realice determinaciones de hechos y conclusiones de derecho que puedan proporcionar a los tribunales la base en la que descansó la decisión del organismo administrativo. De esta forma, los tribunales estarán en posición de descargar responsablemente su función revisora.

El criterio rector en la revisión judicial de una determinación de hechos de una agencia es la existencia de evidencia sustancial. A estos fines, se ha definido evidencia sustancial como *"aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión"*. *Ramírez v. Departamento de Salud*, 147 D.P.R. 901, 905 (1999); *Associated Insurance v. Comisionado de Seguros*, 144 D. P.R. 425, 437 (1997); *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670, 687 (1953). Se ha reconocido la norma jurisprudencial de que, de ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. *Reyes Salcedo v. Policía*, 143 D.P.R. 85 (1997). Dicha norma persigue evitar que los tribunales sustituyan el criterio de la agencia en asuntos enmarcados en su destreza y especialización por el criterio del tribunal revisor.

Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial, en vista de la prueba presentada ... y hasta el punto que se demuestre claramente que la decisión [de la agencia] no está justificada por una evaluación justa del peso de la prueba"*. *Metropolitan S.E. v. A.R.P.E.*, 138 D.P.R. 200, 213 (1995)(citando a *Hilton Hotels v. Junta de Salario Mínimo*, *supra*).

En cuanto a las determinaciones de derecho de la agencia, el tribunal podrá revisarlas en todos sus aspectos, aunque observando un nivel de deferencia por el criterio de la agencia en aquella legislación que ésta implanta. *Oficina de Ética Gubernamental v. Román González*, 151 D.P.R. \_\_\_ (2003); *P.R.T.C. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269 (2000). Esta norma no presupone que el tribunal revisor pueda descartar libremente las interpretaciones o conclusiones de la agencia administrativa, sino que les dará deferencia en la medida que éstas sean razonables. *Misión Industrial v. Junta de Planificación*, 146 D.P.R. 64, 132 (1998). Por tanto, el tribunal revisor sostendrá las conclusiones de la agencia mientras las mismas sean cónsonas con el propósito legislativo y no sean arbitrarias, ilegales o irrazonables. *Id.*; *T-JAC Inc. v. Caguas Centrum Limited*, *supra*.

En aquellos asuntos que puedan ser catalogados como cuestiones mixtas de hecho y de derecho, la norma establecida es que la revisión judicial será análoga a la revisión de asuntos de derecho. Estos asuntos mixtos de

hecho y de derecho surgen ordinariamente en ocasiones en las cuales existe confusión en cuanto a la aplicación del derecho a los hechos particulares del caso. Fernández Quiñones, *Op. Cit.*, pág. 561.

*"Finalmente, el foro judicial podrá sustituir el criterio del organismo administrativo por el propio, sólo en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa.* **No obstante, es axioma judicial que ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.**" *Dye Tex de PR. v. Royal Ins. Co.*, 150 D.P.R. 658 (2000); *Rebollo Vda. de Liceaga v. Yiyi Motors, Motorambar Inc.*, **2004 J.T.S. 4**, pág. 502. (Énfasis en el original.)

### III

Por considerar que los señalamientos de error están íntimamente relacionados, los abordaremos en conjunto. En esencia, la recurrente sostiene que la agencia incidió al concluir que el método de inyecciones de uretano no era el idóneo para la reparación de las filtraciones del apartamento del recurrido.

En su recurso, la recurrente propone que la mejor práctica para la corrección de las filtraciones del apartamento es mediante las referidas inyecciones, las cuales se aplican desde el interior del inmueble. Por su parte, el recurrido insiste que el problema de las filtraciones se debe a que la membrana impermeabilizadora se aplicó incorrectamente y que, por tal razón, procede corregir dicho defecto desde la parte superior del inmueble aplicándola nuevamente. ■

En virtud de lo anteriormente esbozado, es menester destacar que la prueba vertida en la vista administrativa demostró que la recurrente intentó corregir las filtraciones del apartamento del recurrido en dos ocasiones. En junio de 2000, se practicó la primera reparación mediante la aplicación de la membrana impermeabilizadora desde el exterior del apartamento. Posteriormente, en septiembre de 2000, se utilizó el método de las inyecciones de uretano para corregir el defecto. ■

Sin embargo, la resolución recurrida concluye en su determinación de hecho número 9 que *"...se han realizado varios intentos de reparación desde el interior del apartamento de la Parte Querellante, mediante inyecciones de un material de uretano para sellar las grietas filtrantes"*. ■ Asimismo, en sus conclusiones de derecho, la agencia indicó que *"[l]a prueba presentada en este caso demuestra que se han realizado dos reparaciones por medio de inyecciones de compuesto de uretano y que las filtraciones han resurgido con el tiempo"*. ■ De la prueba vertida en la vista, no se desprende que se realizara más de una corrección mediante el sistema de inyecciones. No hallamos en el expediente ni en los documentos ante nuestra consideración información que nos demuestre lo contrario. Por consiguiente, entendemos que la agencia erró al determinar que el sistema de inyecciones se utilizó en más de una ocasión.

Por otro lado, la teoría del recurrido es que el problema radica en que la membrana impermeabilizadora del techo se aplicó incorrectamente. Apoya su contención en el informe de su perito, el ingeniero Solivan, quien indicó que la membrana impermeabilizadora que se utilizó en el techo del apartamento 704 adolece de defectos que la hacen inadecuada para evitar el paso de agua hacia el interior. A tales efectos, el perito explicó que la membrana impermeabilizadora Tremproof 60, la cual se utilizó en el caso de epígrafe, *"se debe reparar... siguiendo las especificaciones del manufacturero... para evitar que el agua pase a la losa estructural del techo en el apartamento 704..."*. ■ De igual modo, explicó que era necesario colocar un panel protector para preservar la integridad de la membrana impermeabilizadora recién instalada. ■ En ese tenor, contestó lo siguiente a preguntas del abogado de la parte recurrida:

*"P ¿Cuál es el propósito de ese "recovery board" o "protection board", si alguno?*

*R Proteger la membrana recién instalada.*

*P Debo entender que una vez echada la membrana, hay que protegerla.*

*R Sí.*

*P ¿Por qué?*

*R Primero, porque el sol la degrada. Segundo, porque ahí van a seguir pintando, van a seguir poniendo ventanas y lo que sea. O sea, que hay otros trabajos de construcción que van a seguirse haciéndose ahí. Y para proteger esa membrana de abuso, que no se rompa."* ▉

Finalmente, el mencionado perito concluyó que la distribución de una serie de inyecciones de uretano no resolvería el problema de las filtraciones. ▉

Luego de un análisis pormenorizado de la prueba desfilada, así como de la transcripción de la vista administrativa, observamos que existe evidencia que contradice las conclusiones del perito del recurrido. Recordemos que como norma reiterada en nuestra jurisdicción, los tribunales apelativos estamos en las mismas condiciones de evaluar la prueba pericial y documental que los foros recurridos. *Rebollo Vda. de Liceaga v. Yiyi Motors, Motorambar Inc., supra.* Cónsono con dicha norma, podemos adoptar nuestro propio criterio en cuanto al valor probatorio de este tipo de evidencia, e incluso descartarla aunque resulte técnicamente correcta. *Culebra Enterprises v. ELA.,* 143 D.P.R. 935 (1997).

En primer término, el ingeniero Arturo Mayol (ingeniero Mayol), perito de la recurrente, indicó que discrepaba de la opinión del ingeniero Solivan en cuanto a dónde se debía colocar la membrana impermeabilizadora. Explicó que el ingeniero Solivan declaró que la referida membrana impermeabilizadora se debía instalar sobre el *"topping"* o el relleno para el declive. ▉ Por su parte, el ingeniero Mayol detalló que primero había que situar la membrana impermeabilizadora y sobre ésta el referido *"topping"*. Señaló que el ingeniero Solivan sostuvo que era necesario un *"protection board"* o plancha protectora, producto que no se utilizó en el techo del recurrido. ▉ Además, el perito de la recurrente describió minuciosamente el proceso de la primera reparación que se practicó en el apartamento del recurrido:

*"En la primera ocasión lo que hicimos fue como todavía teníamos la oportunidad, porque arriba no estaba, la unidad de arriba no estaba habilitada. Pues, localizamos el área donde había las filtraciones, removimos sobre la terraza del apartamento 801 las losas, el 'toping', todo, fuimos hasta la membrana que existía, limpiamos bien y se aplicó nuevamente; se le hizo nuevamente la terraza y procedimos nuevamente a volver a cerrar con un procedimiento de poner topping, la pega, la losa y la lechada."* ▉

Asimismo, otro perito de la parte recurrente, el ingeniero José Antonio Sabat (ingeniero Sabat), presidente de HASA Concrete & Repair, Co., compañía contratada por Flour Daniel para instalar la membrana impermeabilizadora, ▉ declaró que ésta se aplicó correctamente y advirtió que no era necesario colocar un *"protection board"* o plancha protectora sobre ésta. Además, sostuvo lo siguiente sobre el referido panel protector:

*"Cuando se moja se dobla y entonces hace bien difícil que se le pueda colocar otro producto encima y que se mantenga la solidez del sistema. Y por esa razón, pues no se utilizó. También el único uso, este producto no añade un valor de impermeabilidad al sistema. O sea, el sistema lo que lo hace impermeable es la goma, el TP-60 con la goma de uretano. El único uso de 'protection board' es evitar daños a la membrana durante el proceso de construcción. Pero como en esta área casi no había construcción al momento de nosotros hacer la instalación y se le dieron recomendaciones a los contratistas para que tuvieran precauciones de no dañar la membrana, pues no se utilizó...".* ▉

El perito testificó que consultó al fabricante de las membranas impermeabilizadoras que se utilizaron en el apartamento 704, quien en comunicación escrita explicó que el panel protector no era necesario si se colocaba *"un mortero nivelador o un 'topping'"*. En dicho escrito, admitido como exhibit de la recurrente, se expresó lo siguiente:

*"This letter is to confirm that when using Tremproof 60 as a waterproofing membrane under tile and utilizing a nominal 1 grout bed, no protection board is required. The tile crew must use care not to damage the soft rubber during placement of the grout."* 

Finalmente, el perito concluyó que el panel protector no provee protección adicional al sistema de impermeabilización del techo. 

Por su parte, la agencia determinó que había que reparar el techo conforme a las indicaciones del ingeniero Solivan, quien recomendó *"instalar [un] 'recovery board' para proteger la membrana."* Sin embargo, como reseñáramos anteriormente, la prueba pericial demostró que la membrana impermeabilizadora se aplicó correctamente y de acuerdo a las instrucciones del manufacturero. Además, como hemos observado, era innecesario utilizar el panel protector, toda vez que en el presente caso se instaló un mortero nivelador. Por tal motivo, resolvemos que la agencia erró al acoger la recomendación del ingeniero Solivan como el método para corregir las filtraciones en el techo del apartamento del recurrido.

De otro lado, entendemos que la recurrente presentó suficiente evidencia para sustentar la utilización de las inyecciones de uretano como método idóneo y razonable para la reparación. El ingeniero Sabat, perito de la recurrente, indicó que dicho sistema atacaba específicamente el área problemática y no dañaba el resto del techo. Destacó la efectividad del producto y su cualidad elastomédica, la cual permite que se resista cualquier movimiento estructural. Además, expresó que el sistema de inyecciones era ventajoso ya que el término de reparación tomaba dos o tres días. Manifestó que, por el contrario, si se tuviera que arreglar la membrana impermeabilizadora, el término de reparación sería alrededor de dos meses. Por último, concluyó que el método de inyecciones de uretano resolvería *"al 100% los problemas de rotura localizadas en este tipo de membrana."* Por tal motivo, en su opinión pericial el sistema de inyección sería la solución *"más efectiva, la más práctica y la más económica...",* toda vez que los problemas en el apartamento del señor Mattei estaban *"localizados [ y eran] minúsculos".* 

De igual modo, otro perito de la recurrente, el ingeniero Mayol, apuntó que las filtraciones del apartamento del recurrido no estaban generalizadas y que las partes afectadas sólo alcanzaban un dos porciento. Sobre las inyecciones de uretano, aseveró que era el método *"más factible tanto para los residentes del apartamento 704...como para el residente del apartamento 801."* Destacó que cuando se reparó el techo por la parte superior, no residía nadie en el apartamento 801. Acotó que, sin embargo, este apartamento se encontraba habitado en el momento de la presentación de la querella. Señaló que de llevarse a cabo la reparación por la parte superior se afectaría la privacidad de los residentes del referido apartamento. 

El ingeniero Mayol también declaró que el sistema propuesto por la recurrente se practicó en el apartamento contiguo al del recurrido, el cual alegadamente adolecía de los mismos defectos. Explicó que dicha reparación requirió tres visitas y que desde el 2002 no se había documentado reclamo alguno. De otra parte, añadió que visitó el apartamento del señor Mattei después de la primera aplicación de las inyecciones de uretano y observó que en la *"mayoría de las [áreas en las que] se inyectó, se resolvió el problema"* y solamente halló filtraciones en la cocina y en el balcón. 

Como puede observarse, la prueba pericial aportada por la recurrente demostró preponderantemente que el método de inyecciones es el más adecuado para reparar los defectos en el techo del apartamento del recurrido. De igual modo, la conveniencia del referido método encuentra apoyo en la evidencia documental. Por ejemplo,

uno de los documentos que obra en el expediente trata sobre *"la durabilidad o vida útil de los poliuretanos inyectables...[cuyo rendimiento] se ha documentado por más de 25 años en reparaciones a sistemas de alcantarillado de concreto en EUA y Europa."* 

De otra parte, llamamos la atención al hecho de que en la única ocasión en que se llevaron a cabo reparaciones por la parte superior del apartamento del recurrido no había residentes en el apartamento 801, contrario a esta ocasión. Por tal motivo, concluimos que la resolución recurrida en este tenor ciertamente menoscaba o pone en riesgo los derechos de los residentes de dicho apartamento, ya que no se escuchó su posición en la vista administrativa. De implantarse el método de reparación establecido en la resolución, se les privaría a dichos residentes del uso y disfrute pleno de su propiedad y serían afectados por los ruidos que producen las máquinas de reparación. Así lo constató el perito de la recurrente, el ingeniero Sabat, quien advirtió que en la restauración de la membrana impermeabilizadora se utilizaría un martillo que añadiría *"stress o tensión a la losa de hormigón que es el techo"*. Además, es menester destacar que el referido perito subrayó que este tipo de reparación no garantiza que no vuelva a ocurrir el desperfecto. 

Entendemos que, ante tales antecedentes, la alternativa que la agencia seleccionó constituyó la más onerosa debido al tiempo que dura la actividad correctiva, el ruido que genera y la molestia que puede causar a los vecinos. En virtud de ello, entendemos que la agencia actuó irrazonablemente al tomar una determinación que a todas luces afectaría a todos los residentes del Carrion Court Playa Condominium.

Finalmente, la recurrente alega que la agencia erró al no determinar la responsabilidad de United Surety & Indemnity (United) como fiadora. En ese respecto, apuntamos que el Artículo 8 de la Ley Núm. 130 de 13 de junio de 1976, según enmendada, 17 L.P.R.A. sec. 508, y la sección 7 del Reglamento Núm. 226 de 16 de septiembre de 1977 (Reglamento de Construcción) disponen que la fianza que otorga un urbanizador o constructor garantizará los gastos de reparación y corrección de los defectos en la construcción. Se especifica, además, que la fianza se mantendría vigente por el término dos años a partir de la fecha del otorgamiento de la escritura de compraventa del comprador original de la vivienda. De igual modo, el referido Reglamento expresa lo siguiente:

*"Tan pronto se radique querella por un comprador en relación a defectos de construcción, la fianza quedará sujeta a los resultados de esa querella, o sea, se interrumpe por dicha acción el período de vencimiento de dicha fianza."* 

Se desprende de los documentos ante nuestra consideración que en el caso de epígrafe la escritura de compraventa se otorgó el 31 de mayo de 2000. Posteriormente, un año más tarde, el 10 de abril de 2001 se incoó la querella ante la agencia recurrida. Por ende, el período de vigencia de la fianza se interrumpió en el momento en que el recurrido presentó la mencionada causa de acción. 

Cabe mencionar que el DACO indicó en sus conclusiones de derecho que *"la afianzadora de la propiedad, United Surety & Indemnity responde subsidiariamente hasta el monto de la fianza."* Sin embargo, notamos que en la orden emitida por la agencia nada se dispone sobre la responsabilidad de dicha fiadora por los costos de las reparaciones requeridas. Habida cuenta de ello, concluimos que el DACO erró al no incluir la responsabilidad subsidiaria de la fiadora en la parte dispositiva de la resolución recurrida. En consecuencia, dictaminamos que United responderá subsidiariamente hasta el monto de la fianza por los costos de la reparación.

## IV

Por los fundamentos expuestos, se revoca la resolución emitida y notificada por el DACO el 6 de octubre de 2004.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 128

**1.** Querella número 100012894. Apéndice de la recurrente, págs. 1-6.

**2.** El recurrido señaló que las filtraciones se habían generalizado por todo el techo del referido apartamento.

**3.** En la querella, el recurrido se refirió a una carta que envió al señor Jorge Zequeira, arquitecto, el 22 de febrero de 2001. En dicha comunicación, indicó que *"he solicitado la opinión de peritos en la materia y me han indicado que la única solución al problema es impedir la entrada de agua desde el exterior...le solicito que los trabajos de corrección de filtraciones desde el exterior del apartamento comiencen a la mayor brevedad posible."* Apéndice de la recurrente, pág. 126

**4.** La resolución indicó que los arreglos se debían llevar a cabo al tenor de la recomendación del ingeniero Solivan y a la determinación de hecho número 17 la cual reza de la siguiente manera:

*"1. La membrana TREMCO existente se debe reparar adecuadamente siguiendo las especificaciones del manufacturero de los materiales para evitar que el agua pase a la losa estructural de techo en el Apartamento 704, según fue la intención del diseñador del proyecto.*

*2. Para esas reparaciones será necesario efectuar los siguientes trabajos:*

*a. Remover las losas de cerámica existentes*

*b. Remover el mortero de cemento existente*

*c. Disponer de los escombros resultantes de la demolición, en un sitio adecuado*

*d. Limpiar la superficie*

*e. Instalar una membrana nueva, igual a la especificada*

*f. Instalar "recovery board' para proteger la membrana (no se instaló originalmente)*

*g. Instalar mortero de cemento para declive*

*h. Instalar losetas de cerámica iguales o similares a las existentes*

*3. El estimado para efectuar esos trabajos es DIECINUEVE MIL DOSCIENTOS DÓLARES (19,200)"*

**5.** De igual modo, el mismo día, la recurrente presentó una moción en relación a la reproducción de la transcripción de la vista administrativa. Posteriormente, la recurrida sometió la referida transcripción, la cual no fue objetada por el recurrido. Otorgamos 30 días para que la recurrente presentara un alegato suplementario en el que discutiera la prueba oral desfilada a la luz del recurso presentado. Una vez recibido el referido alegato suplementario, concedimos igual término al recurrido para que éste presentara el suyo, gestión que llevó a cabo oportunamente.

**6.** Es menester destacar que en la determinación de hecho número 6 de la resolución recurrida indica que la *"losa de techo objeto de esta querella es también la losa del piso de la terraza del apartamento 801."* Apéndice de la recurrente, pág. 78. Por tal motivo, la reparación de las filtraciones del apartamento del recurrido por la parte superior se tendría que llevar a cabo desde la terraza del apartamento 801.

**7.** Apuntamos que la recurrente intentó reparar el defecto una segunda vez mediante el método de inyecciones, gestión que no le fue permitida. Así lo constató el propio recurrido, quien declaró lo siguiente: *"Yo me negué a que entraran por segunda vez...que entraran al interior de mi apartamento a corregir con uretano. Sí, les permití que arreglaran de cualquier manera que no fuera por el interior. Eso es correcto... Me negué a que entraran por adentro. Que arreglaran de cualquier manera que no fuera por dentro."* Transcripción de la vista de 20 de mayo de 2003, pág. 38.

**8.** Apéndice de la recurrente, pág. 78.

**9.** *Íd.* pág. 82.

**10.** Transcripción de la vista de 20 de mayo de 2003, pág. 109.

**11.** Transcripción de la vista de 13 de junio de 2003, pág. 40.

**12.** Transcripción de la vista de 20 de mayo de 2003, págs. 148-149.

**13.** Transcripción de la vista de 20 de mayo de 2003, pág. 129.

**14.** En el contrainterrogatorio el ingeniero, Solivan declaró que el techo del apartamento 704 debía tener un *"structural slab"* o losa de techo. Encima de éste debía estar situado un *"topping"* o relleno nivelador. Especificó que luego del referido relleno debía haber una membrana impermeabilizadora e *"inmediatamente encima de la membrana se supone que vaya el 'protection board'"*, seguido por el sistema de loseta. Transcripción de la vista de 13 de junio de 2003, págs. 9-12.

**15.** Transcripción de la vista de 13 de junio de 2003, pág. 98.

**16.** Transcripción de la vista de 13 de junio de 2003, pág. 100.

**17.** *Id.*, pág. 161.

**18.** *Íd.*, pág. 167.

**19.** *Íd.*, pág. 168.

**20.** Transcripción de la vista de 13 de junio de 2003, pág. 168.

**21.** Apéndice de la recurrente, pág. 76.

**22.** Transcripción de la vista de 13 de junio de 2003, pág. 172.

**23.** Apéndice de la recurrente, pág. 80.

**24.** Transcripción de la vista de 13 de junio de 2003, pág. 187.

**25.** *Íd.*, pág. 191.

**26.** *Íd.*, pág. 194.

**27.** Transcripción de la vista de 13 de junio de 2003, pág. 175.

**28.** *Íd.*, pág. 180.

**29.** *Íd.*, pág. 111.

**30.** *Íd.*, pág. 116.

31. *Íd.*, pág. 101.

32. *Íd.* Advertimos que los dueños o residentes del apartamento 801 no fueron partes en el procedimiento ante el DACO o ante nos.

33. Transcripción de la vista de 13 de junio de 2003, págs. 103-104. Destacamos que la vista administrativa se celebró en el 2003.

34. *Íd.*, pág. 106.

35. *Íd.*

36. *Id.*, pág. 29.

37. Transcripción de la vista de 13 de junio de 2003, pág. 188.

38. *Íd.*

39. Sección 7 del Reglamento Núm.226 de 16 de septiembre de 1977. (Reglamento de Construcción).

40. Es menester destacar que consta en los autos que el DACO notificó la querella a United. Además, según reza en la resolución recurrida, dicha aseguradora *"no compareció a pesar de haber sido notificada de la vista administrativa."* Apéndice de la recurrente, pág. 77.

41. Apéndice de la recurrente, pág. 81.