*1116 TEXTO COMPLETO DE LA SENTENCIA
Western Pet Scan Institute, Inc. y la Dra. Araceli Rivera Serrano H/N/C Mayagüez Nuclear Med (las recurrentes), nos solicitan que revisemos una Resolución del Departamento de Salud (Salud) dictada el 2 de marzo de 2007 y notificada el 6 de ese mismo mes y año. Mediante la misma, se otorga un Certificado de Necesidad y Conveniencia (CNC) a Diagnostic Nuclear Medicine (la recurrida) para el establecimiento de unas facilidades de PET/CT en el mismo lugar donde ya brinda otros servicios ubicado en el Hospital Comunitario Buen Samaritano. Las facilidades en cuestión se proponen para el área médica de Aguadilla.
Las recurrentes le imputan a Salud tres señalamientos de error en su escrito:

“(1) Erró al otorgar el CNC, ya que la solicitud de la recurrida no cumple con los criterios generales ni específicos para PET y CT establecidos en el Reglamento Núm. 112 del 9 de marzo de 2004 y bajo los cuales se evaluó el caso;

(2) Erró al incluir en su Informe y Resolución Determinaciones de Hechos y Conclusiones de Derecho que no están basadas en la prueba presentada en la vista administrativa del caso.

(3) Erró al admitir en evidencia y considerar el contenido de una Declaración Jurada del perito economista de la parte recurrida, luego de concluida la vista administrativa del caso y sin que la opositora tuviera oportunidad de contrainterrogar al perito sobre,dicha declaración.”

Con el beneficio de los alegatos de las partes y luego de evaluar los planteamientos presentados por ellas, así como el derecho aplicable, resolvemos confirmar la resolución recurrida por los fundamentos que exponemos.
I
El 20 de mayo de 2005, la recurrida presentó una solicitud de CNC ante la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud (SARAFS) con el propósito de que se le autorice *1117 adquirir, instalar y operar una unidad integrada de tomografía de emisión de positrones y tomografía computarizada, conocida como “PET/CT’ para la Región Oeste de Salud. El equipo médico en cuestión se instalaría en la facilidad de medicina nuclear que opera la recurrida con el nombre de “Diagnostic Nuclear Medicine”, ubicada en el Hospital Comunitario Buen Samaritano en Aguadilla, Puerto Rico.
La referida solicitud de CNC fue presentada a tenor con las disposiciones del Reglamento del Departamento de Salud Número 112 del 9 de marzo de 2004, (Reglamento Núm. 112). Luego de la notificación y los avisos reglamentarios de rigor, comparecieron los opositores.
Las recurrentes comparecieron a notificar su oposición e interés en participar en el procedimiento administrativo. Bioimágenes, C.S.P., entidad que también había presentado una solicitud de CNC para que se le autorizara adquirir, instalar y operar una unidad PET/CT en el Municipio de Mayagüez, también notificó su oposición a la solicitud de CNC de Diagnostic e interés en participar en el procedimiento.
Luego de los trámites procesales de rigor, la vista evidenciaría quedó pautada para los días 30 y 31 de marzo de 2006. Las partes presentaron sus respectivos memorandos de derecho.
El 17 de enero de 2006, Bioimágenes y la recurrida presentaron escrito titulado “Acuerdo y Estipulación” en el cual informaron haber llegado a un acuerdo para el retiro mutuo de sus oposiciones a sus respectivas solicitudes de CNC. Según refleja la Minuta y Resolución de la conferencia celebrada el 17 de enero de 2006, en esa misma fecha, Salud declaró con lugar la Estipulación suscrita entre la recurrida y Bioimágenes. Por tanto, se dio por retirada la oposición de Bioimágenes, excusándose su comparecencia a la continuación de procedimientos en el caso.
Toda vez que Salud no cuenta con información sobre el número de procedimientos de CT realizados anualmente, uno de los criterios de evaluación establecidos en el Reglamento Núm. 112, a tenor con lo solicitado por la recurrida, Salud emitió una Orden, el 20 de enero de 2006, requiriendo a las facilidades de CT ubicadas en la Sub-Región de Aguadilla, el área de servicio correspondiente al servicio de PET/CT propuesto por la recurrida, que le notificaran en un plazo no mayor de diez (10) días el número de procedimientos de CT que hubiesen realizado durante los últimos tres (3) años, a saber, 2003, 2004 y 2005.
El 1 de febrero de 2006, Aguadilla X Ray Office and Body Imaging Certer, P.S.C. (Aguadilla X Ray), presentó moción consignando su oposición a la propuesta de la recurrida: Sin embargo, luego de varios incidentes procesales, el 3 de abril de 2006, Aguadilla X Ray presentó escrito en el cual expuso que “[lluego de un depurado análisis de las controversias envueltas en esta petición de CNC, Aguadilla X Ray ha decidido retirar su oposición, retirando así también su solicitud de intervención
La vista evidenciaría comenzó el 5 de junio de 2006 y continuó el 14 de septiembre de 2006. A la misma comparecieron las partes con sus respectivas abogadas. Testificaron por la recurrida el Ledo. Marco A. Reyes, el Dr. Ricardo E. Santiago Montalvo y el perito economista, Dr. Jorge F. Freyre. Por las recurrentes testificó la Leda. Heidi Calero, perito economista.
En la vista celebrada el 14 de septiembre de 2006, Salud concedió un término a las recurrentes para presentar una certificación de Medicare sobre las tarifas de reembolso de los estudios PET y PET/CT. A tenor con lo anterior, el 15 de septiembre de 2006, las recurrentes presentaron “Moción en Cumplimiento de..Orden” acompañando carta suscrita por el Dr. Juan L. Schaening, Director Médico de Medicare Parte B de Triple.S, Inc. para Puerto Rico y las Islas Vírgenes. La recurrida, por su parte, presentó “Moción Sometiendo Declaración Jurada del Dr. Jorge F. Freyre”. Junto a la referida Declaración Jurada, la recurrida acompañó un listado de Medicare de los precios de radiofármacos sujetos a reembolso, entre ellos, el radiofármaco “FDG” que se utiliza para los estudios PET y PET/CT.
*1118 El 26 de septiembre de 2006, las recurrentes presentaron “Oposición a Moción Sometiendo Declaración Jurada del Dr. Jorge Freyre y Solicitud de Orden y/o Vista”. La recurrida presentó, a su vez, “Réplica a Oposición a Moción Sometiendo Declaración Jurada...”, en la cual expuso detalladamente su postura. Salud emitió Orden el 11 de octubre de 2006 en la que admitió la Declaración Jurada del Dr. Freyre y concedió a la parte recurrente un plazo de diez (10) días para replicar. El 30 de octubre de 2006, las partes Recurrentes presentaron “Moción en Cumplimiento de Orden y Reiterando Oposición a Declaración Jurada” en la cual reiteran sus argumentos antes expuestos en su Oposición del 26 de septiembre de 2006. La transcripción de la prueba oral detalla lo sucedido en cuanto al preámbulo de esta controversia procesal.
La oficial examinadora aquilató toda la prueba testimonial y documental sometida por las partes. Finalmente, rindió un informe o recomendación favorable a la solicitud del CNC.
El 2 de marzo de 2007, la Secretaria de Salud dictó la Resolución recurrida acogiendo el Informe y Recomendación de la oficial examinadora concediendo el CNC solicitado por la recurrida. La Resolución fue archivada en autos y notificada el 6 de marzo de 2007. Las recurrentes solicitaron reconsideración, y la recurrida presentó “Oposición a Solicitud de Reconsideración”. Transcurrido el término dispuesto para que la Secretaria acogiera la Solicitud de Reconsideración presentada por las recurrentes, el 1 de mayo de 2007, éstas presentaron el Recurso de Revisión de epígrafe aduciendo la existencia de los tres (3) errores ya expuestos.
II
Los señalamientos de error de las recurrentes se analizan frente a doctrinas firmemente establecidas en nuestro ordenamiento jurídico.
La revisión judicial de las determinaciones (administrativas) de las agencias de gobierno se limita a determinar si la actuación fue razonable y sólo cede cuando está presente alguna de las siguientes situaciones: (1) cuando la decisión no está basada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la aplicación de la ley; y (3) cuando ha mediado una actuación irrazonable o ilegal. Otero v. Toyota, res. el 3 de febrero de 2005, 163 D.P.R._(2005), 2005 JTS 13.
Por consiguiente, las decisiones de las agencias administrativas merecen la mayor deferencia judicial cuando se trata de la interpretación y aplicación de sus propios reglamentos. Esta deferencia se debe a que son ellas las que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados. Al momento de revisar una decisión administrativa, el criterio rector para los tribunales será la razonabilidad en la actuación de la agencia. Otero v. Toyota, supra; Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77-78 (2004).
En relación con las determinaciones de hechos de la agencia, la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU), Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. see. 2175, establece que éstas deben ser sostenidas por el tribunal revisor, siempre que estén basadas en "evidencia sustancial" contenida en el expediente administrativo. Metropolitana S.E. v. A.R.P.E., 138 D.P.R. 200, 212-213 (1995). Esta disposición recoge estatutariamente la norma jurisprudencial que establece que, de ordinario, los tribunales no deben intervenir con las determinaciones de hechos de un organismo administrativo si éstas se apoyan en prueba suficiente que surja del récord considerado en su totalidad.
Consecuentemente, para convencer al Tribunal de que la evidencia en la cual se basó la agencia para formular una determinación de hecho no es sustancial, la parte afectada debe demostrar que existe otra prueba en el récord que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998). Las recurrentes deben demostrar que con fundamento en la prueba presentada, claramente la decisión de la agencia no está justificada *1119 por una evaluación justa del peso de la prueba que tuvo ante su consideración. Rebollo v. Yiyi Motors, supra, a la pág. 77.
Las cuestiones de derecho sí pueden ser revisadas en todos los aspectos. Sin embargo, esta revisión no implica que los tribunales apelativos tienen libertad absoluta para sustituir las referidas conclusiones. Tampoco gozamos de libertad absoluta para descartar libremente dichas conclusiones e interpretaciones de la agencia. Rebollo v. Yiyi Motors, supra.
El “legislador” dejó en manos del Secretario de Salud la determinación de conceder o denegar los CNC sujeto a unas guías y criterios, que aparejan un ámbito de discreción. El Tribunal Supremo de Puerto Rico (TSPR) dispuso en Lab. Inst. Med. Ava. v. Lab. C. Borinquen, Inc., 149 D.P.R. 121, 133-134 (1999), que aunque la ley contiene disposiciones específicas y rigurosas que el Secretario debe observar durante las etapas del proceso de conceder o denegar un CNC, ello sólo significa que su discreción está delimitada. Las disposiciones aludidas demarcan el alcance de su discreción, pero no son una camisa de fuerza que restringe innecesariamente la propia facultad discrecional del Secretario. El TSPR explicó que al Secretario se le delegan amplios poderes, con normas para delimitar su ejercicio, pero otorgándole a la vez discreción en el desarrollo y ejecución de la política pública.
III
Al hacer una evaluación, a la luz de la totalidad del expediente, no encontramos razón alguna para intervenir con la determinación de Salud. Las conclusiones de la Oficial Examinadora que rindió el Informe acogido por Salud para conceder el CNC recurrido tienen una base racional y se apoyan en la prueba recogida en el expediente.
Las agencias administrativas tienen que ser consistentes cuando interpretan sus reglamentos, pues, “¡l]a determinación administrativa no puede producir soluciones contradictorias para situaciones fundamentalmente idénticas”. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105, 137 (2002).
En su alegato, la recurrida evidencia como Salud, por tercera ocasión consecutiva, adjudica que acorde con el Reglamento Núm. 112 existen diferencias entre equipos integrados PET/CT y equipos PET y CT individuales. Al hacerlo así, el Departamento da cumplimiento a la norma sentada por el Tribunal Supremo. Salud ha utilizado su pericia diligentemente, haciendo determinaciones consistentes y justas, cuya repercusión es el beneficio de una comunidad que tendrá acceso a un equipo médico altamente especializado.
Según señaló la Secretaria de Salud, dicho equipo se habrá de instalar en una facilidad de medicina nuclear que opera dentro de un hospital. Por esta razón, puede proyectarse que habrá de utilizarse para prestar servicios no sólo a los pacientes en general del Hospital y población de la Región de Salud de Salud Oeste, sino a los pacientes del propio centro de radioterapia “Radiation Therapy and Cancer Institute” (RTCI) que opera la recurrida en dicho Hospital.
La propia oficial examinadora consignó en su Informe que:

“Actualmente, Diagnostic ofrece el servicio de estudios avanzados en el campo de la medicina nuclear. La acción propuesta de instalar y operar un equipo PET-CT en dicha facilidad de salud es consistente con el plan de desarrollo a largo plazo de Diagnostic, cuyo objetivo fundamental consiste en ofrecer a los residentes de la población Oeste la tecnología más avanzada en el campo de la medicina nuclear y radiológica.

La instalación y operación de una unidad PET-CT en Diagnostic complementaría los servicios que actualmente se ofrecen en dicha facilidad de medicina nuclear y en la facilidad hospitalaria donde opera. También es consistente con la determinación de autorizar el establecimiento de un centro de radioterapia para 
*1120
pacientes de cáncer en el Hospital Buen Samaritano.

A pesar del peculiar desfile de prueba con las intervenciones de las abogadas, el expediente apoya las conclusiones de Salud. Existe base sustancial en el récord para apoyar la determinación recurrida. Tampoco consideramos irracional, irrazonable o ilegal dichas conclusiones. ”

El TSPR ha resuelto que el otorgamiento de un CNC es un mecanismo de planificación, mediante el cual el Secretario de Salud formula e implanta política pública sobre los servicios de salud. El TSPR añadió que la decisión de otorgar o denegar un CNC surge de un proceso evaluativo institucional que culmina con la decisión personal del Secretario. De lo anterior, es evidente que la decisión final administrativa apareja el uso de su discreción. El propio TSPR indicó que el Secretario tiene discreción para obviar un criterio reglamentario, cuando ello sea procedente. Lab. Inst. Med. Ava. v. Lab. C. Borinquen, Inc., supra, a las páginas 132-133.
Al evaluar el extenso informe de la Oficial Examinadora, a la luz de los planteamientos de las partes y el derecho aplicable, constatamos que Salud tomó en cuenta todos los factores necesarios para adjudicar adecuadamente este caso. El extenso Informe que se sustenta con la prueba oral y documental del caso contiene 70 determinaciones de hechos, todas basadas en la prueba que aquilató la oficial examinadora luego de recibirla.
Este Tribunal no encuentra razón alguna para intervenir con el valor probatorio que la Oficial Examinadora le dio a las versiones conflictivas que aparecen en la prueba. Nada nos intima que la prueba de las recurrentes, más allá de su insistente oposición, sea más creíble que la de la recurrida. En esto concedemos deferencia a la oficial que tuvo ante sí la prueba. Lo importante es que hay base sustancial en el récord para apoyar su informe. De hecho, en el informe (en ocasiones) se relata la prueba de ambas partes para llegar a una conclusión racional basada en el récord, como cuando hizo referencia a las tasas de población o proyecciones de aumento poblacional para la región solicitada.
Las conclusiones de derecho están específicamente relacionadas con referencias a las determinaciones de hechos (que aparecen en el récord oral y documental de este caso).
De inicio, el expediente aclara que la solicitud de la recurrida es para el establecimiento de unas facilidades que ni siquiera estaban originalmente contempladas en el Reglamento Núm. 112. Ello es así, porque el propuesto proyecto para facilidades es para la operación de un equipo que combina la tecnología de PET y CT en un mismo evento, lo que redunda en un beneficio técnico como equipo nuevo e innovador.
La prueba sostiene que este servicio genera resultados muy superiores a los que se logran mediante los estudios separados PET y CT. Además, Salud tomó en consideración que las facilidades se instalarían en una ubicación en la que la recurrida ya opera un centro de radioterapia. Con ello verifica, el compromiso de ésta de continuar ofreciendo servicios accesibles de la más alta tecnología. El informe aclara que el Reglamento Núm. 112 no establece criterios generales ni específicos para evaluar una solicitud de CNC para un equipo PET-CT, ya que era una tecnología integrada más avanzada que no se contempló al aprobarse el referido Reglamento.
No obstante lo anterior, el expediente sostiene la aplicación de los criterios generales y específicos de evaluación comparables a centros de PET y CT, de conformidad al Reglamento Núm. 122. Además, abunda en razones racionales para reconocer las variaciones correspondientes. La diferencia técnica en el servicio ofrecido (PET-CT) vis a vis lo que contempla el Reglamento Núm. 112 (sólo PET o sólo CT), permite a la Secretaria de Salud el ejercicio discrecional al evaluar el ofrecimiento. A pesar de ello, Salud no liberó a la recurrida de su responsabilidad de verificar la viabilidad del servicio y le aplicó los criterios correspondientes a los servicios similares. La prueba en el récord no es inconsistente con los hallazgos de la oficial examinadora.
*1121 En cuanto a los “criterios generales de evaluación”, el Informe detalla 6 justificaciones para entender que la solicitud de la recurrida conforma el Reglamento Núm. 112. Los mismos están apoyados en el récord. La oficial examinadora resaltó la discreción que tiene Salud al evaluar una solicitud de CNC e interpretar los criterios reglamentarios a tenor con lo que conviene al interés general y al bien común.
Las recurrentes vehementemente reclaman que el CNC recurrido se aparta desmedidamente de los “criterios específicos” relacionado al aspecto poblacional y la demanda del servicio a ofrecerse en el proceso de evaluar la solicitud del CNC.
No obstante, el Informe detalla un análisis razonable. La oficial examinadora en este caso, contempló el elemento poblacional y los ofrecimientos existentes al analizar la prueba.
En el Informe se consideró detalladamente: (1) la relación de la transacción solicitada a tenor con el plan de desarrollo de servicios a largo plazo; (2) la necesidad actual y proyectada de la población afectada; (3) la existencia de alternativas; (4) la relación con el sistema de salud operante en el área; y (5) la existencia de una demanda por servicios a ofrecerse en el área. También consideró otros factores, tales como: (a) el impacto que la transacción solicitada puede tener sobre las necesidades de entrenamiento para los estudiantes de medicina que practican internado en el Hospital Buen Samaritano; (b) el por ciento de la población del área a servirse. En cuanto a esto último, el Informe detalla las razones porqué el estimado de oferta que ofrecieron las recurrentes no le persuadió. En adición, indicó y fundamentó con hallazgos, que en cuanto a los estimados de oferta hay espacio para la transacción ofrecida (Informe Oficial Examinador, págs. 29-31)
Finalmente concluyó que Salud ha autorizado 2 facilidades PET en la Región Oeste, ambas en Mayagüez, pero ninguna con una facilidad de PET-CT integrado. Añadió que determinar que no hay cabida para una unidad PET-CT en toda la Región Oeste compuesta de 15 municipios basado en que ya se otorgaron 2 CNC’s para instalar y operar equipos PET en Mayagüez, privaría a toda esa población de una tecnología necesaria y superior.
Luego de ello, pasa a detallar cómo el criterio específico en cuanto a población y demanda de servicios para el caso de las facilidades CT lo cumple cómodamente el servicio ofrecido por la recurrida. Su conclusión se fundamenta en la prueba que aquilató en este caso, específicamente, el criterio poblacional.
Para evaluar el tercer señalamiento de error, se hace necesario referirse a' la prueba oral y al récord. No existe un parámetro claro que sostenga el inmeritorio señalamiento de error por las recurrentes.
Al examinar cuidadosamente la transcripción, podemos tener un cuadro claro del incidente procesal relacionado al requerimiento de esa prueba. La misma alude al incidente procesal relacionado a la prueba de los reembolsos de Medicare en cuanto al servicio ofrecido, ello para propósitos de evaluar un aspecto de la viabilidad económica del proyecto ofrecido por la recurrida.
La información suministrada por la recurrida complementa la información suministrada por las recurrentes, luego de la vista en su fondo celebrada el 14 de septiembre de 2006. La información oficial de Medicare ofrecida por las recurrentes sólo produjo los códigos y tarifas de reembolso de Medicare de los estudios PET y PET/CT. La contención de la recurrida fue que el costo del radiofármaco Fluorodeoxyducose, F-18 (FDG), utilizado en la realización de estudios PET y PET/CT, es también reembolsado por Medicare, al igual que por los demás planes médicos.
La tarifa de reembolso por el radiofármaco FDG fue tomada en consideración en la elaboración del informe del perito de la recurrida, por lo que admitir para propósitos adjudicativos sólo la información provista por las partes recurrentes distorsionaría la información brindada por la recurrida. Nuevamente, sólo se trata de una *1122 información oficial de Medicare que suplementa la ofrecida por las recurrentes, que por alguna razón no incluyó el reembolso por el radiofármaco FDG.
Para resaltar lo inmeritorio del señalamiento, las recurrentes no cuestionan en ningún momento la validez de dichas tarifas relacionados a los fármacos. Tampoco alegan que sea incorrecto que Medicare reembolsa por el radiofármaco FDG la cantidad de $490.
La contención de las recurrentes a los efectos de que se introdujo prueba adicional no es correcta. Las recurrentes presumen que la oficial examinadora descartó completamente la posibilidad que la recurrida se pronunciara en relación a la prueba documental (de Medicare) que ellas producen, una vez terminada la vista evidenciaría. El récord no resalta en ningún momento que se prohibió a la recurrida ofrecer la misma prueba u otra aclaratoria, ya que se relacionaba a una información oficial de Medicare. Lo que no se le permitió a la recurrida fue reabrir el desfile de prueba para traer a su perito a declarar.
Debemos entender que el señalamiento de error de las recurrentes va más bien dirigido en cuanto a declaración de la oficial examinadora de admitir la declaración jurada que acompañó dicha prueba. Sin embargo, del récord tampoco surge preocupación alguna por las recurrentes cuando la propia oficial examinadora, al decidir que no permitiría abrir nuevamente un desfile de prueba para oír al perito de la recurrida, le invitó a presentar una declaración jurada, cosa que no se materializó únicamente porque la oficial examinadora impuso un término de días (y un límite de párrafos) que la abogada de la recurrida estimó imposible de cumplir. En ese momento, la prueba en nada verifica objeción alguna de las recurrentes.
Las recurrentes cuestionan la admisión de la referida declaración jurada, mas esa preocupación es infundada por cuanto nada hay en el récord que evidencie el valor probatorio, si alguno, que le confirió la oficial examinadora. A lo sumo, la declaración sólo sirvió para introducir la información que por alguna razón no incluyeron las recurrentes al suministrar información oficial de los reembolsos por Medicare.
En el Informe lo único que utilizó la oficial examinadora fue la información oficial de Medicare, tal y como había advertido en la vista evidenciaria. La oficial examinadora sólo utilizó la información de Medicare suministrada por ambas partes.
Además, el récord claramente evidencia que a las recurrentes se le permitió replicar, cosa que no hicieron, y se empeñaron en solicitar una vista oral para cuestionar la declaración jurada. Lo único en lo que la oficial examinadora se reafirmó fue en no reabrir el desfile de prueba oral para ninguna de las partes. En ello actuó imparcialmente. Tomando en cuenta lo que trasciende del peculiar estilo de ofrecer y discutir prueba en el caso, desconocemos razón alguna para creer que se ha cometido un error que amerite revocar la determinación administrativa.
El récord evidencia que en todo momento la oficial examinadora permitió a las partes presentar un documento e inclusive una declaración jurada (prueba oral, páginas 129 y 130) relacionado a los reembolsos de Medicare. Lo que no le permitió a las partes fue reabrir el desfile de prueba para argumentaciones y contrainterrogatorios adicionales. Aplicarle la misma norma a las recurrentes, no es más que ser consistente con lo mismo que se le aplicó en la vista evidenciaria a la recurrida. Si la oficial examinadora entendió que la discusión (entre las abogadas, que claramente revela la prueba oral) se subsanaba con la presentación de un documento oficial de Medicare, ese es un manejo de “sala” mtinario en el que no intervendremos.
Es meridianamente claro que el 11 de octubre de 2006, la oficial examinadora le permitió a las recurrentes presentar un documento de refutación adicional, relacionado a los reembolsos de los fármacos. Esa determinación cae bajo la orden que se había dictado en la vista evidenciaría de que se le proveyera a Salud dicha información para completar el caso. Si la información oficial de Medicare que ofrecieron las *1123 recurrentes, una vez terminada la vista evidenciaría, estaba incompleta, entonces no vemos razón alguna para que objeten que fuera suplementada por la recurrida. No tiene nada que ver conque no se le permitía ofrecer evidencia. También ha indicado el TSPR que: ...[e]l que triunfa en un tribunal de justicia debe de ser aquél al que le asiste la razón, no el que pretende o resulta ser el más listo o “jaiba”. Capó Cruz v. Depto. de la Vivienda, 139 D.P.R. 314, 327 (1995).
IV
Por las razones expuestas, se confirma la Resolución de Salud que otorga un CNC en este caso. Se trata de una decisión que se apoyó en prueba sustancial y que se emitió conforme a las normas aplicables.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones